## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   *Plaintiff*,<br><br> v.<br><br><br>COMMONWEALTH OF PENNSYLVANIA; and AL SCHMIDT, in his official capacity as Secretary of the State of Pennsylvania,<br><br>   *Defendants*. | Case No. 2:25-CV-01481<br><br>Hon. Cathy Bissoon |

### MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO INTERVENE AS DEFENDANTS OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE PENNSYLVANIA STATE CONFERENCE, AND STACEY TAYLOR

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

  I.  STATES—NOT THE FEDERAL GOVERNMENT—ARE RESPONSIBLE FOR
     VOTER REGISTRATION LIST MAINTAINENCE. ...................................................... 2

  II.  THE FEDERAL GOVERNMENT SEEKS TO USURP STATE CONTROL OVER
      VOTER ROLLS AND CONSOLIDATE SENSITIVE DATA ACROSS AGENCIES. ... 4

  III. THE DEPARTMENT OF JUSTICE SEEKS SENSITIVE PENNSYLVANIA VOTER
       DATA FROM DEFENDANTS. ....................................................................................... 5

  IV. PROPOSED INTERVENORS' AND THEIR MEMBERS' SENSITIVE PERSONAL
       INFORMATION AND VOTING RIGHTS ARE THREATENED BY THIS LAWSUIT.
       ..................................................................................................................................... 6

     A.  The Proposed Intervenors ...................................................................................... 6

     B.  Proposed Intervenors' Concerns ............................................................................ 8

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ....................................................................................................................... 11

  I.  PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS OF RIGHT
     UNDER RULE 24(a)(2). ............................................................................................. 11

     A.  The Motion Is Timely and Will Not Prejudice Existing Parties. ............................... 11

     B.  Proposed Intervenors Have a Sufficient Interest in This Litigation. .......................... 12

        1.  Proposed Intervenors Have an Interest in Protecting the Right to Vote. ............. 12

        2.  The NAACP and the State Conference Have a Protectable Interest in Guarding
           Their Organizational Priorities. ........................................................................... 14

        3.  Proposed Intervenors Have a Significantly Protectable Interest in Safeguarding
           Voter Data. .......................................................................................................... 16

     C.  Proposed Intervenors' Interests May Be Impaired by the Disposition of This Action.
       ..................................................................................................................................... 18

     D.  Proposed Intervenors' Interests Are Not Adequately Protected by Existing Parties.. 19

II.  ALTERNATIVELY, THE COURT SHOULD GRANT PERMISSIVE
     INTERVENTION. ............................................................................................................ 20

CONCLUSION .................................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adapt of Phila. v. Phila. Hous. Auth.*,
    No. 98-cv-4609, 2004 WL 1858345 (E.D. Pa. Aug. 10, 2004) .............................................16

*Am. Civ. Rts. Union v. Phila. City Comm'rs*,
    872 F.3d 175 (3d Cir. 2017).................................................................................................3

*Am. Farm Bureau Fed'n v. EPA*,
    278 F.R.D. 98 (M.D. Pa. 2011).........................................................................................12

*Archbrook Laguna, LLC v. New Age Elecs., Inc.*,
    No. 08-1421, 2008 WL 11626121 (D.N.J. June 17, 2008).....................................................16

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013)...................................................................................................................2

*Atlas Data Priv. Corp. v. We Inform, LLC*,
    2025 WL 2444153 (D.N.J. Aug. 25, 2025) .........................................................................17

*Bellitto v. Snipes*,
    No. 16-61474, 2016 WL 5118568 (S.D. Fla. Sept. 20, 2016) ..............................................13

*Blum v. Schlegel*,
    150 F.R.D. 38 (W.D.N.Y. 1993)..........................................................................................16

*In re Chocolate Confectionary Antitrust Litig.*,
    No. 1:08-MDL-1935, 2008 WL 4960194 (M.D. Pa. Nov. 18, 2008)....................................16

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
    No. 1:18-cv-11657, 2020 WL 1432213 (S.D.N.Y. Mar. 24, 2020)......................................22

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
    170 F.R.D. 93 (E.D.N.Y. 1996).........................................................................................22

*Constand v. Castor*,
    No. 15-5799, 2016 WL 5681454 (E.D. Pa. Oct. 3, 2016) .....................................................16

*Donald J. Trump for President, Inc. v. Murphy*,
    Civil Action No. 20-10753, 2020 WL 6573382 (D.N.J. Sept. 23, 2020) ..............................10

*Donaldson v. United States*,
    400 U.S. 517 (1971).............................................................................................................12

*Eakin v. Adams County Bd. of Elections*,
149 F4th 291 (3d Cir. 2025) ............................................................................2

*Fish v. Kobach*,
309 F. Supp. 3d 1048 (D. Kan. 2018) .............................................................13

*Foster v. Love*,
522 U.S. 67 (1997)............................................................................................2

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) ...................................................................16, 19

*Harris v. Pernsley*,
820 F.2d 592 (3d Cir. 1987)........................................................................10, 12

*Issa v. Newsom*,
No. 20-01055, 2020 WL 3074351 (E.D. Cal. June 10, 2020) ........................14

*Kitzmiller v. Dover Area Sch. Dist.*,
229 F.R.D. 463 (M.D. Pa. 2005) .....................................................................21

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998)........................................................................19, 20

*Kobach v U.S. Election Assistance Comm'n*,
No. 13-cv-4095, 2013 WL 6511874 (D. Kan. Dec. 12, 2013) .......................14

*Koprowski v. Wistar Inst. of Anatomy & Biology*,
No. Civ. A. 92-CV-1132, 1993 WL 332061 (E.D. Pa. Aug. 19, 1993)............21

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022) ...........................................................................14

*Land v. Del. River Basin Comm'n*,
No. 3:16-cv-897, 2017 WL 63918 (M.D. Pa. Jan. 5, 2017) .......................11, 21

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) ...........................................................................13

*Libertarian Party of Pa. v. Wolf*,
No. CV 20-2299, 2020 WL 6580739 (E.D. Pa. July 8, 2020)..........................21

*Martin v. Crittenden*,
347 F. Supp. 3d 1302 (N.D. Ga. 2018) ............................................................13

*Mazo v. N.J. Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) ...............................................................................2

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ........................................................................13

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
    72 F.3d 361 (3d Cir. 1995)....................................................................10, 11, 12

*N.C. All. for Retired Ams. v. Hirsch*,
    No. 1:23CV837, 2023 WL 9422596 (M.D.N.C. Dec. 15, 2023), *report and*
    *recommendation adopted*, 2024 WL 308513 (M.D.N.C. Jan. 26, 2024)...............................21

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958)...............................................................................................6

*New Ga. Project v. Raffensperger*,
    No. 1:21-CV-01229-JPB, 2021 WL 2450647 (N.D. Ga. June 4, 2021)...............................21

*Pa. Gen. Energy Co., LLC v. Grant Twp*.,
    No. CA 14-209, 2015 WL 6002163 (W.D. Pa. Oct. 14, 2015), *aff'd*, 658 F.
    App'x 37 (3d Cir. 2016)........................................................................................21

*Pa. State Conf. of NAACP Branches v. Sec'y of Commonwealth of Pa.*,
    97 F.4th 120 (3d Cir. 2024) ...............................................................................2, 3

*Pa. State Conf. of NAACP v. Chapman*,
    No. 1:22-cv-339, 2023 WL 121867 (W.D. Pa. Jan. 6, 2023) ....................................11, 13, 14

*Paher v. Cegavske*,
    Case No. 3:20-cv-00243, 2020 WL 2042365 (D. Nev. Apr. 28, 2020)...............................14

*Pennsylvania v. President*,
    888 F.3d 52 (3d Cir. 2018)....................................................................................19

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ...................................................................17

*Pub. Int. Legal Found., Inc. v. Winfrey*,
    463 F. Supp. 3d 795 (E.D. Mich. 2020)..................................................................12

*Pub. Int. Legal Found. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024)...................................................................................17

*Pub. Int. Legal Found. v. Boockvar*,
    431 F. Supp. 3d 553 (M.D. Penn. 2019) .................................................................17

*Pub. Int. Legal Found. v. Chapman*,
    595 F. Supp. 3d 296 (M.D. Pa. 2022), *vacated on standing grounds, Pub. Int.*
    *Legal Found. v. Sec'y of Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025)....................17

*Pub. Int. Legal Found. v. N.C. Bd. of Elections*,
    996 F.3d 257 (4th Cir. 2021) ................................................17

*Smiley v. Holm*,
    285 U.S. 355 (1932) .........................................................2

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .........................................................3

*Tex. League of United Latin Am. Citizens v. Whitley*,
    No. SA-19-ca-074, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) ..................13, 17

*Torah Soft Ltd. v. Drosnin*,
    No. 00 CIV. 0676, 2001 WL 1425381 (S.D.N.Y. Nov. 14, 2001) ........................16

*Transource Pennsylvania, LLC v. Dutrieuille*,
    No. 21-2567, 2022 WL 2235466 (3d Cir. June 22, 2022) ......................12

*True the Vote v. Hosemann*,
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ....................................17

*United States v. Alcan Aluminum, Inc.*,
    25 F.3d 1174 (3d Cir. 1994) ..............................................19

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012) ....................................13

*United States v. Territory of Virgin Islands*,
    748 F.3d 514 (3d Cir. 2014) ..............................................18

*Wallach v. Eaton Corp.*,
    837 F.3d 356 (3rd Cir. 2016) .............................................11

*Yorkshire v. Internal Revenue Serv.*,
    26 F.3d 942 (9th Cir. 1994) ..............................................20

**Statutes**

4 Pa. Code
    § 183.14(c) ...............................................................16
    § 183.14(c)(3) ............................................................18

52 U.S.C.
    § 20501(b) ................................................................3
    § 20507 ...................................................................3
    § 20507 (i)(1) ............................................................6
    § 21083(a)(1)(A) .........................................................3

**Other Authorities**

Compl., *League of Women Voters, et al. v. U.S. Department of Homeland Security, et al.*, No. 1:25-cv-03501-UNA (D.D.C. Sept. 30, 2025), ECF No. 1......................18

Emily Badger & Sheera Frenkel, *How Musk's Team Collects and Connects, Data About You*, N.Y. Times (Apr. 9, 2005) ......................................................................4

Exec. Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos ("Data Consolidation EO"), 90 Fed. Reg. 13681 (Mar. 20, 2025) ..........................................................................................................................4

Exec. Order 14248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 25, 2025) ............................................5, 18, 20

Fed. R. Civ. P.
  24(a) .......................................................................................................................10
  24(a)(2) ..................................................................................................................10
  24(b) .................................................................................................................10, 20
  24(b)(1) ..................................................................................................................10
  24(b)(1)(B) .............................................................................................................20
  24(b)(3) ..................................................................................................................10

Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, WhistleBlower Says*, N.Y. Times (Aug. 26, 2025) ................................................8

Presidential Memo, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025)..........................................................................................8

U.S. Dept. of Just. Civ. Rts. Div, *Privacy Act Statement* ...........................................18

## <u>INTRODUCTION</u>

The National Association for the Advancement of Colored People ("NAACP"), the NAACP Pennsylvania State Conference ("State Conference"), and Stacey Taylor (collectively, "Proposed Intervenors") move to intervene in this action to vindicate significant interests that the existing parties do not adequately represent. The NAACP and the State Conference are large civil rights organizations with thousands of members who live and vote in the Commonwealth of Pennsylvania, including naturalized citizens, first-generation voters, and voters who were formerly incarcerated. *See* Ex. A, Declaration of Anthony Ashton ("Ashton Decl.") ¶¶ 1, 4, 5, 13; Ex. B, Declaration of Stacey Taylor ("Taylor Decl."). ¶¶ 4, 13. Stacey Taylor is the President of the State Conference and a Pennsylvania resident and voter. Taylor Decl. ¶¶ 3-4.

In an extraordinary move, the federal government demands the sensitive voter registration data of every Pennsylvanian, ostensibly to remove ineligible voters from voter registration lists while broadly sharing this sensitive information between a plethora of agencies. The NAACP's and State Conference's members, including President Taylor, face serious harms if the federal government wins access to their sensitive, personal information. Such harms include disenfranchisement, the impermissible burden on their right to vote, and heightened and unjustified surveillance at a time when the federal government is consolidating Americans' data in unprecedented ways. In addition to these harms, the government's aggressive grab for NAACP and State Conference member voter information will intimidate voters and deter civic engagement, harming the organizations' core missions of increasing civic and political participation, including through voter registration, engagement, and protection.

Proposed Intervenors therefore make this timely motion to protect those interests in this legal action.

# BACKGROUND

## I.    STATES—NOT THE FEDERAL GOVERNMENT—ARE RESPONSIBLE FOR VOTER REGISTRATION LIST MAINTAINENCE.

The Constitution "invests the States with responsibility for the mechanics" of federal elections so long as "Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); U.S. Const. art. I, § 4, cl. 1; *see Eakin v. Adams County Bd. of Elections*, 149 F.4th 291, 305 (3d Cir. 2025) (referring to states' "prerogative" of regulating their own orderly elections). States' broad authority over federal and state elections encompasses "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counties of votes, duties of inspectors and canvassers, and making and publication of election returns." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 136 (3d Cir. 2022) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). Thus, states bear primary responsibility for determining voter eligibility and maintaining voter registration lists, stemming from their sole power to prescribe their own voting qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (discussing Congress's lack of power to "regulate the qualifications of its own electorate"). Where the Constitution contemplates federal involvement, it lies with Congress, not the executive.

Further, none of the statutes under which the federal government sues here to obtain sensitive voter data authorize it to usurp state voter list maintenance responsibilities or to pool sensitive voter information to purge and intimidate voters. Indeed, Congress enacted those laws to protect voters and facilitate their access to the ballot. Congress enacted the Civil Rights Act of 1960 ("CRA") to rein in "efforts to deny the right to vote," including "arbitrary registration procedures" to qualify to vote. *Pa. State Conf. of NAACP Branches v. Sec'y of Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024). Through the CRA, "Congress sought to protect minorities' access to the polls in States with 'a pattern or practice' of denying the right to vote on racial

2

grounds," *Id.* at 133. Those efforts specifically targeted "systematic campaigns to subvert minorities' access to the polls" through devices like rejected voter registration applications. *Id.* at 134. The CRA "authorized courts to register voters in areas of systematic discrimination," whereby election officials were engaging in practices of disqualifying potential voters. *Id.* (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966)).

Over three decades later, Congress enacted the National Voter Registration Act ("NVRA") to achieve four main goals: "(1) increasing the number of registered voters, (2) increasing participation in federal elections, (3) maintaining current and accurate voter rolls, and (4) ensuring the integrity of the voting process." *Am. Civ. Rts. Union v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017); 52 U.S.C. § 20501(b). The NVRA's legislative history demonstrates that "Congress was wary of the devastating impact purging efforts previously had on the electorate. . . . Accordingly, the NVRA both protects voters from improper removal from the rolls and places limited requirements on *states* to remove ineligible voters from the rolls." *Am. Civ. Rts. Union*, 872 F.3d at 179 (emphasis added). It does not charge the federal government with applying strict list-maintenance procedures to state registration lists. *See* 52 U.S.C. § 20507 (listing duties imposed onto states).

Lastly, the Help America Vote Act ("HAVA") was enacted to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. Civ. Rts. Union,* 872 F.3d at 180. Under the HAVA, voter registration lists are "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A) (emphasis added).

## II.    THE FEDERAL GOVERNMENT SEEKS TO USURP STATE CONTROL OVER VOTER ROLLS AND CONSOLIDATE SENSITIVE DATA ACROSS AGENCIES.

The federal government is embarking on a quest to create a national voter roll,[1] and to combine numerous data sources to verify voter eligibility. *See* Exec. Order 14248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 25, 2025) (requiring DOGE to "take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials"). This pursuit is part of the federal government's goal of creating inter-agency databases for the sharing of sensitive, personal information across government agencies. *See* Exec. Order 14243, Stopping Waste, Fraud, and Abuse by Eliminating Information Silos ("Data Consolidation EO"), 90 Fed. Reg. 13681 (Mar. 20, 2025) ("Agency Heads shall take all necessary steps, to the maximum extent consistent with law, to ensure Federal officials . . . have full and prompt access to all unclassified agency records, data, software systems, and information technology systems . . . for purposes of pursuing Administration priorities related to the identification and elimination of waste, fraud, and abuse."). Such combination of data and its use for purposes other than those for which it was submitted subjects the electorate to invasive and powerful government surveillance on a scale never before countenanced by the American public or its elected representatives. Not only does it violate trust and invade privacy, however, it also raises serious accuracy concerns that heighten the probability of unwarranted government action to curb citizens' rights.[2]

---

[1] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025)

[2] Emily Badger & Sheera Frenkel, *How Musk's Team Collects and Connects, Data About You*, N.Y. Times, at A1 (Apr. 9, 2005) ("When the I.R.S. tried to study if it could identify people eligible for the earned-income tax credit . . . it ran into different programs and data sets using different definitions for 'family' and 'income' . . . . Try matching data across an even wider array of government systems, and the incongruities would multiply.").

As part of this unprecedented data grab and consolidation, the federal government is pursuing sensitive voter information in a scheme to purge and intimidate voters. President Trump signed Executive Order 14248 on March 25, 2025, directing the United States Attorney General to "enter into information-sharing agreements, to the maximum extent possible, with the chief State election official or multi-member agency of each State . . . to provide the Department of Justice with detailed information on all suspected violations of State and Federal election laws discovered by State officials." Exec. Order 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Section 5(b) of the Executive Order directs the Department of Justice ("Department" or "DOJ") to target states unwilling to share sensitive voter data or to cooperate in the investigation or prosecution of alleged election offenses. *Id.* The Executive Order also threatens those states with withholding grants or funds that the Department of Justice awards and distributes. *Id.* Pursuant to that Executive Order, the Department of Justice ("DOJ") has requested statewide voter registration lists from at least thirty-six states. Most of those states have refused to turn over sensitive voter data. Compl. ¶¶ 42-43, ECF No. 1. The DOJ selectively responded by filing eight suits between September 16, 2025, and September 25, 2025, against California, Maine, Michigan, Minnesota, New Hampshire, New York, Oregon, and Pennsylvania. These efforts support the government's cynical campaign to promote the widely disproven notion of rampant voter fraud.

## III.    THE DEPARTMENT OF JUSTICE SEEKS SENSITIVE PENNSYLVANIA VOTER DATA FROM DEFENDANTS.

On June 23, 2025, the DOJ, citing only the HAVA, sent a request for data to the Pennsylvania Secretary of State. Compl. ¶ 33, ECF No. 1. In a follow-up request on August 4, 2025, the DOJ demanded the "current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list" from the November 2022 general election to the November 2024 general election and for the Secretary to "include all fields contained within the

list," pursuant to the Public Disclosure Provision of the NVRA, 52 U.S.C. § 20507 (i)(1). *Id.* ¶ 36. The DOJ instructed the Secretary to identify and provide registration information, including voting history, for voters identified as ineligible to vote by the Secretary of State due to a possible flag for citizenship status, a felony conviction, or an adjudication of incompetency. *Id.* ¶ 37. On August 14, 2025, the DOJ clarified that its request for registration lists with "all fields" includes unredacted full names, dates of birth, residential addresses, driver's license numbers, and the last four digits of Social Security numbers. *Id.* ¶ 39.

The Secretary offered public voter records for review, Compl. ¶¶ 42-43, ECF No. 1, but did not provide the DOJ with unfettered access to voter data. The DOJ filed suit on September 25, 2025, against the Commonwealth of Pennsylvania and its Secretary of State to compel access, *id.*, alleging that it is entitled to sensitive voter information broadly under the CRA, the Public Disclosure Provision of the NVRA, and Section 303 of the HAVA.

## IV. PROPOSED INTERVENORS' AND THEIR MEMBERS' SENSITIVE PERSONAL INFORMATION AND VOTING RIGHTS ARE THREATENED BY THIS LAWSUIT.

### A. The Proposed Intervenors

The NAACP is the nation's oldest and largest organization dedicated to the advancement of civil rights in the United States. Ashton Decl. ¶ 4. It is a formal membership organization, with more than 200,000 members nationwide and approximately 6,700 in Pennsylvania. *Id.* ¶ 5. The NAACP addresses the concerns of the national organization, its state chapters, and individual members, including in areas such as voting rights, civil rights, and privacy concerns. *Id.* ¶¶ 6-8. It accomplishes this goal through several channels, including mobilizing voters through non-partisan civic engagement and election-related outreach efforts, as well as voter protection campaigns. *Id.* ¶ 8. Additionally, the NAACP has a long history of safeguarding its members' personal information from compelled disclosure. *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S.

6

449, 458 (1958) (prohibiting compelled disclosure of NAACP membership lists); Ashton Decl. ¶ 7.

The State Conference is a nonpartisan organization operating in Pennsylvania and affiliated with the NAACP. Taylor Decl. ¶ 5. The State Conference has existed for 91 years and has approximately 6,700 members in 44 branches across the state. *Id.* As a constituent and subordinate unit of the NAACP, the State Conference works diligently to carry out the mission of the NAACP which is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." *Id.*

Both the NAACP and the State Conference have thousands of members who are Pennsylvania voters who participated in 2022 and 2024 statewide and federal elections. Ashton Decl. ¶ 5; Taylor Decl. ¶ 5. Many of these members also plan to vote in upcoming elections. Ashton Decl. ¶ 5; Taylor Decl. ¶ 5. The sensitive voter data of Proposed Intervenors' members is sought after by the DOJ and is at risk of misuse and abuse. Compl. ¶ 48, ECF No. 1.

Stacey Taylor is the President of the State Conference, Taylor Decl. ¶ 4, a Pennsylvania resident, and a registered voter in Pennsylvania since 2002. *Id.* ¶¶ 2-3. She is a registered Pennsylvania voter who has participated in state and federal elections between 2022 and 2024. *Id.* She intends to vote in upcoming elections, including the November 4, 2025, statewide election, the May 2026 Primary Election, and the November 2026 General Election. *Id.* Prior to the DOJ's suit, President Taylor was not aware that DOJ was in possession of her sensitive voter information, or that the Commonwealth may have provided any voter information to the DOJ. *Id.* ¶ 9. She was not notified that information would be shared and she did not—and does not—consent to the sharing of the information that the federal government seeks in this case. *Id.* ¶ 11. President Taylor

fears that her personal information and voting history will be shared by Defendants to the DOJ. *Id.* ¶ 12.

### B. Proposed Intervenors' Concerns

Proposed Intervenors have legitimate concerns about federal government access to the sensitive voter data requested in this lawsuit. Ashton Decl. ¶¶ 10-14; Taylor Decl. ¶¶ 10-13, 18. First, the current administration has made clear that it requests the data at issue to remove people from the voter rolls, raising grave concerns about disenfranchisement. Taylor Decl. ¶ 8; Ashton Decl. ¶ 10. Second, the NAACP and its members have been singled out and targeted by government officials and community members who disagree with the NAACP's mission and advocacy efforts. Ashton Decl. ¶ 12; Taylor Decl. ¶¶ 13, 17-18, 21. Proposed Intervenors therefore fear targeted and retaliatory efforts from the federal government, given that many of their members may hold political views and engage in civic activities disfavored by the current presidential administration.[3] *Id.* Additionally, many NAACP and State Conference members hold political views and engage in civic activities disfavored by the current presidential administration, which has repeatedly disregarded privacy protections over sensitive personal data.[4] Ashton Decl. ¶¶ 10-14; Taylor Decl. ¶¶ 17-21.

The NAACP, the State Conference, and their members, including President Taylor, are fearful that their personal information will be mishandled and misused if Defendants provide the federal government with their information. Ashton Decl. ¶ 14; Taylor Decl. ¶ 18. Concerns related

---

[3] *See* Presidential Memo, *Countering Domestic Terrorism and Organized Political Violence* (Sept. 25, 2025) (announcing plans to investigate and "disrupt" organizations and networks the federal government perceives as politically radical, including organizations that convey "extremism on migration, race, and gender" ).

[4] For example, public reports have indicated that the Department of Government Efficiency (DOGE) placed the security of millions of Social Security numbers at risk through improper maintenance. *See* Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, WhistleBlower Says*, N.Y. Times (Aug. 26, 2025).

to the misuse of data by the federal government are exacerbated by federal agencies consolidating and sharing private information through multiple governmental databases. Ashton Decl. ¶ 11; Taylor Decl. ¶¶ 16-19. The consolidation of personal information into governmental databases is alarming to members, especially as the current administration weaponizes personal sensitive information against perceived political adversaries. *Id.*

If successful, the federal government's data grab—which raises well-founded concerns about the federal government's misuse and mishandling of sensitive voter data, voter disenfranchisement, and retaliatory efforts—will intimidate voters and deter civic engagement, frustrating the NAACP's and the State Conference's missions. Ashton Decl. ¶¶ 10-15; Taylor Decl. ¶¶ 14, 19-21. This chilling of basic constitutional rights not only harms the NAACP's and the State Conference's members, including President Taylor, but also will undermine their efforts to advance their core priorities of fostering civic participation and voter engagement. Ashton Decl. ¶¶ 8, 10, 15. Taylor Decl. ¶ 20. Each election cycle, the NAACP and State Conference engage in efforts to get out the vote, including educating Black voters and other voters in Pennsylvania on voter registration processes, providing educational guides on local candidates to increase voter engagement, and focusing on strategies to eliminate voter suppression both nationally and in Pennsylvania. Ashton Decl. ¶¶ 8-9; Taylor Decl. ¶¶ 5-7. The NAACP recruits and deploys over 100,000 volunteers to mobilize and support voters through litigation, voter protection efforts, and advocacy of the right to vote on behalf of voters nationwide. *See* Ashton Decl. ¶ 8. These volunteers include Pennsylvania State Conference members. Taylor Decl. ¶ 6. The NAACP plays a critical role for its members and the public by serving as a trusted messenger on voting rights issues. Ashton Decl. ¶ 10. The State Conference is successful at encouraging participation in the political process by individuals who would otherwise avoid it. Taylor Decl. ¶ 6. If the federal

government prevails, the NAACP and the State Conference will have to divert considerable resources from its core missions to deal with the fallout, including efforts to ensure that personal information in the hands of the government is accurate and consistent. Ashton Decl. ¶¶ 10-15; Taylor Decl. ¶¶ 14, 19-21.

## **LEGAL STANDARD**

Proposed Intervenors are entitled to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), or in the alternative, permissively under Federal Rule of Civil Procedure 24(b). Rule 24(a) is "liberally construe[d]" in favor intervention. *Donald J. Trump for President, Inc. v. Murphy*, Civil Action No. 20-10753, 2020 WL 6573382, at *1 (D.N.J. Sept. 23, 2020); *see also Harris v. Pernsley*, 820 F.2d 592, 605-06 (3d Cir. 1987) (discussing the "clear language" of Rule 24(a) that is "obviously designed to liberalize the right to intervene in federal actions"). Pursuant to Rule 24(a)(2), a non-party is entitled to intervention under the following circumstances:

> (1) The application must be timely; (2) the applicant has a sufficient interest in the litigation; (3) the applicant may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 365-66 (3d Cir. 1995) (quoting *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987)).

Under Rule 24(b), upon timely motion, a court may allow a nonparty to intervene permissively when it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "[T]he court must consider whether the intervention will unduly delay or prejudice the adjudication of the original partiers' rights." *Id.* 24(b)(3).

**ARGUMENT**

**I.    PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS OF RIGHT UNDER RULE 24(a)(2).**

**A. The Motion Is Timely and Will Not Prejudice Existing Parties.**

Courts assess timeliness of a motion to intervene under three factors: (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay. *Wallach v. Eaton Corp.*, 837 F.3d 356, 371 (3rd Cir. 2016). Each factor weighs in favor of Proposed Intervenors because this case was filed only days ago. *Pa. State Conf. of NAACP v. Chapman*, No. 1:22-cv-339, 2023 WL 121867, at *4 (W.D. Pa. Jan. 6, 2023) (resolving all timeliness factors in favor of movant because the case was filed only a few days before motion to intervene).

Regarding the first factor, Proposed Intervenors file this motion in the infancy of litigation. *See Chapman*, 2023 WL 121867, at *4 (granting intervention for a motion filed a few days after a complaint). This motion is filed well before any answer is due, and existing parties are far off from discovery, let alone dispositive motions. *See Land v. Del. River Basin Comm'n*, No. 3:16-cv-897, 2017 WL 63918, at *3 (M.D. Pa. Jan. 5, 2017) (granting intervention of right to intervenors who moved five months after the filing of a complaint and one month after the court granted intervention to other intervenors).

The Court need not dwell on the second and third factors regarding prejudice resulting from delay and the reason for delay because no delay would ensue from intervention. "[T]he stage of the proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved." *Mountain Top Condo Ass'n*, 72 F.3d at 370. No existing deadlines would have to be altered due to intervention, and regardless, the federal government could not complain of delay because it has moved to stay proceedings during the federal

government shutdown. ECF No. 15. Proposed Intervenors learned about the federal government's

action and the risks it posed to their members shortly after the filing of its complaint, *See* Taylor

Decl. ¶¶ 8-10, and then filed this motion within days of its commencement.

**B. Proposed Intervenors Have a Sufficient Interest in This Litigation.**

The Third Circuit has deemed that a party has an interest warranting intervention of right

if that interest is "significantly protectable" and subject to a tangible threat by an existing party's

action. *Mountain Top Condo. Ass'n*, 72 F.3d at 366 (quoting *Donaldson v. United States*, 400 U.S.

517, 531 (1971)); *Harris v. Pernsley*, 820 F.2d 592, 601 (3rd Cir. 1987). The interest also must be

"specific to the intervenor," "capable of definition," and "directly affected in a substantially

concrete fashion by the relief sought." *Transource Pennsylvania, LLC v. Dutrieuille*, No. 21-2567,

2022 WL 2235466, at *2 (3d Cir. June 22, 2022) (cleaned up).  This standard is less demanding

than Article III standing requirements. *Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 107 n.3

(M.D. Pa. 2011).

The Proposed Intervenors' have numerous interests at stake that meet those standards in

seeking to prevent data of President Taylor and the NAACP's and State Conference's members

from falling into the hands of the federal government should it prevail in this litigation.

1.   Proposed Intervenors Have an Interest in Protecting the Right to Vote.

The NAACP and the State Conference seek to vindicate their interests in protecting their

members' right to vote, and President Taylor seeks to vindicate her interest in protecting her own

right to vote. The federal government's demand for sensitive voter data underpins its

unprecedented efforts to usurp state list maintenance procedures, which would facilitate improper

purging of individuals from voter registration rolls. Compl. ¶ 16, ECF No. 1; Taylor Decl. ¶ 8;

Ashton Decl. ¶ 10. Courts have found that organizations' interests in protecting their members

from this type of harm to be significantly protectable. *Pub. Int. Legal Found., Inc. v. Winfrey*, 463

F. Supp. 3d 795, 799 (E.D. Mich. 2020) (finding the interest in "ensuring that no unreasonable measures are adopted that could pose an elevated risk of removal of legitimate registrations" sufficient to warrant intervention); *Bellitto v. Snipes*, No. 16-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sept. 20, 2016) (granting intervention where organization "asserts that its interest and the interests of its members would be threatened by the court-ordered 'voter list maintenance' sought by Plaintiffs"); *see also Chapman*, 2023 WL 121867, at *5 (finding sufficient interest where relief sought would impact participation in electoral process); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434 (5th Cir. 2011) (granting intervention to voter who had an interest to "protect his right to vote"); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1307 (N.D. Ga. 2018) (granting intervention as of right when a voter "will be potentially disenfranchised").

Further, this harm is not speculative or attenuated. Courts in numerous circuits have found that methods to verify voter eligibility, particularly when verification is based on stale information from state motor vehicle agencies, have impermissibly disenfranchised voters or burdened their right to vote. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 722-24 (9th Cir. 2025) (holding that required documentary proof of citizenship "DPOC" in federal elections violated NVRA and CRA); *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1106, 1110-11 (D. Kan. 2018) (finding that the required DPOC with a voter registration application unduly burdened the right to vote); *United States v. Florida*, 870 F. Supp. 2d 1346, 1347, 1350-51 (N.D. Fla. 2012) (holding that the use of stale driver's license data to purge voters due to eligibility concerns likely violated NVRA); *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-ca-074, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019) (voter purge based on inaccurate drivers' license data). And, as described above, courts have found a significantly protectable interest in preventing improper purges.

2.    <u>The NAACP and the State Conference Have a Protectable Interest in Guarding Their Organizational Priorities.</u>

Disclosure of NAACP and State Conference member voter information to the government will harm their core mission of increasing civic and political participation, including through voter registration, engagement, and protection. Courts routinely grant intervention of right to organizations in voting cases when they demonstrate harm to their core missions and activities. *See, e.g.*, *Chapman*, 2023 WL 121867, at *5 (intervention of right granted to Republican Party based on interest in ensuring free and fair elections); *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (political party satisfied Rule 24(a) interest requirement because they expend resources to recruit and train volunteers whose conduct is regulated by challenged law); *Issa v. Newsom*, No. 20-01055, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020) (intervention of right granted to civil rights groups that would have to work to educate their members on election laws and "assisting those members" in the voting process"); *Paher v. Cegavske*, Case No. 3:20-cv-00243, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020) (organizational efforts "to promote the franchise and ensure the election of Democratic Party candidates" a protectable interest); *cf. Kobach v U.S. Election Assistance Comm'n*, No. 13-cv-4095, 2013 WL 6511874, at *4 (D. Kan. Dec. 12, 2013) (granting permissive intervention to advocacy groups whose broad interests lie in "either increasing participation in the democratic process, or protecting voting rights, or both, particularly amongst minority and underprivileged communities").

The overreach that the federal government seeks to engage in here through acquiring all Pennsylvanians' voter data frustrates the NAACP's and State Conference's mission and harms their members. They have an interest in protecting a critical component of their election-year programs and other organizational priorities—ensuring that their members, and all

14

Pennsylvanians, are given a full and equal opportunity to exercise their fundamental right to vote. Ashton Decl. ¶¶ 8-9, 13-15; Taylor Decl. ¶¶ 5-6, 13, 19-21. However, NAACP and State Conference members are materially chilled from the exercise of the right to vote by increased federal scrutiny or threatened harassment. *See* Ashton Decl. ¶¶ 11–13; Taylor Decl. ¶¶ 14, 19-21. Amidst renewed baseless proclamations of widespread voter fraud and threatened prosecutions of political dissidents, this selective, unprecedented, unwarranted, and invasive inquiry into the personal information of voters discourages voters from exercising their political voice and rights. NAACP and State Conference members are, and historically have been, fearful of federal surveillance, law enforcement investigations, and federal demands for personal information. *Id*. This concern is particularly acute under an administration that has repeatedly and publicly targeted political adversaries or people who dissent. Ashton Decl. ¶ 11-12; Taylor Decl. ¶ 19. And, it is further heightened by the federal government's recent and direct attacks on long-standing civil rights protections, and thereby Black communities, including the targeted deployment of the national guard in cities with significant Black populations.

Further, the NAACP and State Conference assist their members and other prospective voters in the voter registration process, educate them about voting in upcoming elections, and mobilize voters to the polls. Ashton Decl. ¶¶ 8-9, 15; Taylor Decl. ¶¶ 5-6, 20. Their work is undermined if the federal government is permitted to acquire and use all voter registration data, including for the purpose of purging registered voters from state registration lists before Election Day or wielding the threat of surveillance and criminal investigation against perceived adversaries and those simply exercising their fundamental right to vote. Ashton Decl. ¶¶ 10-15; Taylor Decl. ¶¶ 17-21. Responding to data security threats by Plaintiff and any resulting voter registration purge also will strain NAACP and State Conference resources as the organizations work to address the

concerns of the members and resist government efforts to suppress their votes. *Id.* The NAACP

and State Conference thus have a significant protectable interest here.

      3.    <u>Proposed Intervenors Have a Significantly Protectable Interest in Safeguarding</u>
<u>Voter Data.</u>

Proposed Intervenors oppose the sharing of the requested voter information with the federal

government, especially sensitive information exempted from disclosure under 4 Pa. Code §

183.14(c). *See* Ashton Decl. ¶¶ 10–11, 15; Taylor Decl. ¶ 18. Courts have recognized protecting

sensitive information as a substantially protectable interest. *See In re Chocolate Confectionary*

*Antitrust Litig.*, No. 1:08-MDL-1935, 2008 WL 4960194, at *1, n.3 (M.D. Pa. Nov. 18, 2008)

(granting intervention to protect the confidentiality of materials in an ongoing investigation);

*Constand v. Castor*, No. 15-5799, 2016 WL 5681454, at *3 (E.D. Pa. Oct. 3, 2016) (granting

intervention to protect confidentiality of agreement terms); *Archbrook Laguna, LLC v. New Age*

*Elecs., Inc.*, No. 08-1421, 2008 WL 11626121, at *1 (D.N.J. June 17, 2008) (protecting

confidentiality of employee and business information was a sufficient interest under Rule

24(a)(2)); *Adapt of Phila. v. Phila. Hous. Auth.*, No. 98-cv-4609, 2004 WL 1858345, *3 (E.D. Pa.

Aug. 10, 2004) (protecting medical records a sufficient interest); *see also Fund for Animals, Inc.*

*v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (finding impairment in part because "there is no

question that the task of reestablishing the status quo if the [plaintiff] succeeds in this case will be

difficult and burdensome"); *Torah Soft Ltd. v. Drosnin*, No. 00 CIV. 0676, 2001 WL 1425381, at

*2 (S.D.N.Y. Nov. 14, 2001) (finding that the intervenor had a sufficient interest preventing

disclosure during discovery in underlying litigation of personally identifying and confidential

information); *Blum v. Schlegel,* 150 F.R.D. 38, 39 (W.D.N.Y. 1993) (granting limited intervention

to protect the intervenor's confidentiality interests during discovery). Further, courts routinely

have limited disclosure of the sensitive information sought here, including state driver's license

numbers and home addresses, in records request for voter data, including in requests made pursuant to the NVRA.[5]

The NAACP's and the State Conference's interests, and the privacy interests of members, including President Taylor, are significantly threatened by the requested turnover of sensitive voter data to the federal government. As discussed above, NAACP and State Conference members, including President Taylor, have a historically justified fear of federal surveillance, law enforcement investigations, and federal demands for personal information. *See* Ashton Decl. ¶¶ 13-15; Taylor Decl. ¶¶ 12, 14, 16-19, 21. In election cases, these types of intrusions through shared sensitive information "exemplif[y] the power of government to strike fear and anxiety and to intimidate the least powerful among us." *Tex. League of United Latin Am. Citizens*, 2019 WL 7938511, at *2 (analyzing the state's misuse of driver's license data and its threatening demand for additional information indicating citizenship status). This fear is especially justified given that the Department publicly advertises that it would share information "if [the Department] became aware of a violation or potential violation of law or regulation outside the scope of our

---

[5] *Atlas Data Priv. Corp. v. We Inform, LLC,* 2025 WL 2444153, at *2 (D.N.J. Aug. 25, 2025) (holding that the NVRA does not preempt state law that enables certain officials to seek to stop private actors' publication of their home addresses and unlisted telephone numbers); *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022) (exempting the disclosure of DMV records in NVRA requests), *vacated on standing grounds, Pub. Int. Legal Found. v. Sec'y of Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561 n.3 (M.D. Penn. 2019) ("[T]he Disclosure Provision does not guarantee unfettered access to confidential sensitive information."); *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *Pub. Int. Legal Found. v. N.C. Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (authorizing redactions in voter data); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344-46 (N.D. Ga. 2016) (exempting the disclosure of sensitive information, like Social Security numbers and birth dates, in response to NVRA records requests); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014) (holding that States are not prohibited under the NVRA from protecting voter registrants' social security numbers and birthdates).

jurisdiction." *See* Compl. ¶ 41, ECF No. 1; U.S. Dept. of Just. Civ. Rts. Div, *Privacy Act Statement*.

Further, the federal government frequently declares that the Department shares sensitive voter

information, including information exempted from public inspection under 4 Pa. Code §

183.14(c)(3), with other agencies, including DHS, USCIS, SSA, HHS, IRS, and DOGE. *See* Exec.

Order No. 14248, 90 Fed. Reg. 14005, 14007 (Mar. 25, 2025) ("The Commissioner of Social

Security shall take all appropriate action to make available the Social Security Number

Verification Service, the Death Master File, and any other Federal databases containing relevant

information to all State and local election officials"); *see supra* Background Section II. In fact, it

also appears that DOJ may already be sharing some Pennsylvania voters' data. Taylor Decl. ¶¶ 10-

11. Proposed Intervenors have no reasonable expectation that information shared with the DOJ

would be kept secure, treated confidentially, or used for limited purposes.

To the contrary, Proposed Intervenors anticipate that voters' sensitive information shared

with the DOJ will be used to improperly consolidate disparate databases and sources of

information into an error ridden master database whose methodology is dubious, and legality are

already called into question. *See* Compl., *League of Women Voters, et al. v. U.S. Department of

Homeland Security, et al.*, No. 1:25-cv-03501-UNA (D.D.C. Sept. 30, 2025), ECF No. 1 (alleging

violations of the Privacy Act of 1974).

**C.  Proposed Intervenors' Interests May Be Impaired by the Disposition of This Action.**

If the federal government prevails and gets its hands on the voter data it requests, Proposed

Intervenors' interests will be harmed. The determination of whether a significantly protectable

interest exists is intertwined with the determination of impairment of that interest. *See United

States v. Territory of Virgin Islands*, 748 F.3d 514, 519 (3d Cir. 2014). As set forth above, Proposed

Intervenors' interests in protecting their members' right to vote, their core organizational activities,

and the privacy of their members' sensitive information, will be impaired if the government obtains the relief it seeks.

### D.  Proposed Intervenors' Interests Are Not Adequately Protected by Existing Parties.

Demonstrating that interests will not be adequately protected by existing parties requires a showing of diverging interests from those of the existing parties. *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1185 n.15 (3d Cir. 1994). This burden is "generally 'treated as minimal' and requires the applicant to show 'that representation of [its] interests "*may be"* inadequate.'" *Pennsylvania v. President*, 888 F.3d 52, 60 (3d Cir. 2018) (citation omitted).

Proposed Intervenors easily clear this hurdle. All existing parties are government entities. When government entities are involved, courts presume that these entities represent private interests when "the concerns of the proposed intervenor, e.g. a 'public interest' group, closely parallel those of the public agency. . . . [However,] when an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998). Proposed Intervenors' interests clearly are not represented by the federal government, as outlined in detail above. Nor do Defendants adequately represent Proposed Intervenors' interests because the State weighs the interests of voters against various practical and policy concerns, and their interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Id.*  For this reason, it has been "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norto*n, 322 F.3d 728, 736 (D.C. Cir. 2003). Defendants weigh registrants' privacy interests against list maintenance and disclosure obligations under state and federal mandates, and must additionally

consider the threat of federal "withholding of grants and other funds." Exec. Order No. 14248 § 5(b)(ii), 90 Fed. Reg. 14005, 14008 (Mar. 25, 2025).

Further, Defendants have demonstrated Proposed Intervenors' interests are not adequately protected, as they have allegedly already offered some, albeit public, voter information to the Department of Justice. Compl. ¶ 43, ECF No. 1. Proposed Intervenors do not—and courts need not—assume either party would protect the sensitive information requested here. *See Yorkshire v. Internal Revenue Serv.*, 26 F.3d 942, 945 (9th Cir. 1994) ("[B]ecause the I.R.S., the only named defendant, did not oppose disclosure of Keller's consolidated tax returns, S & P's interest in the confidentiality of those tax returns was not adequately represented by the parties to the suit.").

Additionally, even though Defendants have thus far refused to accede to the federal government's demands, it is far from certain that they will continue to do so or will not agree to a resolution of this case that would harm Proposed Intervenors' interests. "[I]t is not realistic to assume that the [government's] programs will remain static or unaffected by unanticipated policy shift." *Kleissler*, 157 F.3d at 974. Where government entities may change how they prioritize and weigh interests throughout litigation, or reach an agreement based on various priorities, only Proposed Intervenors adequately represent their interests.

## II. ALTERNATIVELY, THE COURT SHOULD GRANT PERMISSIVE INTERVENTION.

As an alternative to intervention of right, this Court should exercise its discretion to grant permissive intervention. Rule 24(b) authorizes permissive intervention when the intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "In deciding whether to permit intervention under Rule 24(b), courts consider whether the proposed intervenors will add anything to the litigation. The Court also must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties'

rights." *Land v. Del. River Basin Comm'n*, No. 3:26-cv-897, 2017 WL 63918, at *5 (W.D. Pa. Jan. 5, 2017) (cleaned up). "The permissive intervention rule is to be construed liberally with all doubts resolved in favor of permitting intervention." *Koprowski v. Wistar Inst. of Anatomy & Biology*, No. Civ. A. 92-CV-1132, 1993 WL 332061, at *2 (E.D. Pa. Aug. 19, 1993) (cleaned up).

Proposed Intervenors meet all three requirements here. They timely filed this motion, *see supra* Argument Section I.A, and assert claims and defenses that share a common question of law or fact. In the election context, courts have found this prong fulfilled where the main litigation could affect the ability to vote or dilute votes. *See, e.g.*, *Libertarian Party of Pa. v. Wolf*, No. CV 20-2299, 2020 WL 6580739, at *1 n.1 (E.D. Pa. July 8, 2020) (noting that movants' claims related to the "same code sections and nominations processes" and that the requested relief could dilute votes); *New Ga. Project v. Raffensperger*, No. 1:21-CV-01229-JPB, 2021 WL 2450647, at *2 (N.D. Ga. June 4, 2021) (finding common question of law or fact because invalidating statute challenged in main litigation "would impair their ability to elect their chosen candidates,"); *N.C. All. for Retired Ams. v. Hirsch*, No. 1:23CV837, 2023 WL 9422596, at *3 (M.D.N.C. Dec. 15, 2023), *report and recommendation adopted*, 2024 WL 308513 (M.D.N.C. Jan. 26, 2024) (common question in "whether the challenged laws are inconsistent with the Voting Rights Act or Constitution.")

Finally, Proposed Intervenors will add to this litigation. In undertaking this inquiry, courts consider whether intervenors' interests would be identical to those of the existing parties. *Kitzmiller v. Dover Area Sch. Dist.*, 229 F.R.D. 463, 471 (M.D. Pa. 2005), *see also Pa. Gen. Energy Co., LLC v. Grant Twp.*, No. CA 14-209, 2015 WL 6002163, at *3 (W.D. Pa. Oct. 14, 2015), *aff'd*, 658 F. App'x 37 (3d Cir. 2016) ("Because the interests of PIOGA's members are directly affected by the outcome of this litigation and because those interests are not identical to

21

Plaintiff[], permissive intervention is appropriate"). As discussed *supra* Argument Section I.D., they are not. Proposed Intervenors seek to defend fundamental individual privacy interests and the right to vote, through the lens of a community that has been historically disenfranchised and surveilled and targeted by the government. They bring important insights and perspective otherwise absent from this litigation, *see supra* Background Section IV, namely the perspective of voters directly impacted and whose interests in their own personally identifying information are of central concern. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, No. 1:18-cv-11657, 2020 WL 1432213, at *8 n.9 (S.D.N.Y. Mar. 24, 2020) (intervention granted to groups that serve people "directly impacted" by challenged action, offering "unique perspective" that would "greatly contribute to the Court's understanding of the case" (citation omitted)); *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996) (similar). Because Proposed Intervenors' participation will assist rather than cause prejudice tor delay, the Court should grant permissive intervention.

## CONCLUSION

For the reasons stated above, the Court should grant Proposed Intervenor's Motion to Intervene to protect their protected privacy interests.

Dated: October 7, 2025                          Respectfully submitted,

                                                By:   */s/       David Smith*
                                                David Smith, Pa. Id. No. 21480
                                                Dilworth Paxson LLP
                                                1650 Market Street, Suite 1200
                                                Philadelphia, PA 19103
                                                Tel.: (215) 575-7000
                                                Fax: (215) 754-4603
                                                dsmith@dilworthlaw.com

                                                Edward G. Caspar, D.C. Bar No. 1644168*
                                                Leah Frazier, D.C. Bar No. 492540*
                                                Robert N. Weiner, D.C. Bar No. 298133*

Gillian Cassell-Stiga, D.C. Bar No.
90032319*
Ryan Snow, D.C. Bar No. 1619340*
Grace Thomas, D.C. Bar No. 90018667*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: 202-662-8600
ecaspar@lawyerscommittee.org
lfrazier@lawyerscommittee.org
rweiner@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org
rsnow@lawyerscommittee.org
gthomas@lawyerscommittee.org

*Pro hac vice application forthcoming

Attorneys for Proposed Intervenors