# Exhibit 5



**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF STATE**

August 18, 2025

*Via Electronic Mail*

Michael E. Gates
Deputy Assistant Attorney General
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530
Voting.section@usdoj.gov

Dear Mr. Gates:

I write in response to your letter dated August 4, 2025, requesting information regarding the Commonwealth's procedures for complying with list maintenance provisions of the National Voter Registration Act ("NVRA").[1] My office is committed to ensuring that our voting lists are properly maintained according to state and federal law, and our efforts to do so are detailed in my July 23, 2025, response to the letter from the Department of Justice letter dated June 23, 2025 ("July Response"), which contained a comprehensive review of Pennsylvania's list maintenance procedures and links to the Department's Annual Report on the Administration of Voter Registration ("Annual Report"). A copy of the July Response is enclosed for your reference as you review our discussion of data provided in the Election Administration and Voting Survey (EAVS). While it is our local county election officials who are responsible for maintaining their voter lists, the Pennsylvania Department of State ("Department") works diligently with all 67 county election offices to help them ensure that all electoral processes are fully compliant with federal and Pennsylvania laws.[2]

Your letter requests a list of election officials responsible for implementing Pennsylvania's program for voter registration list maintenance from November 2022 to the present, including local elections officials. Pennsylvania voter registration law vests the Commonwealth's 67 county voter registration commissions with principal responsibility for implementing voter

---

[1] 52 U.S.C. §§ 20501–20511.

[2] In light of the subsequent letter dated August 14, 2025, from Assistant Attorney General Harmeet Dhillon, we will respond separately to your request for specific information about Pennsylvania's registered voters.

registration list maintenance.[3] The county election offices are staffed by individuals hired by county leadership, not the Department of State. The roles and functions of each office staff member are dictated by county leadership, which may vary in accordance with municipal law. Accordingly, we are not in a position to provide you with the names of each individual who performed each specific function.

You have also requested the steps taken to ensure that the Commonwealth's list maintenance program has been properly carried out in full compliance with the NVRA. Know that the Department and its 67 counties engage in all reasonable efforts to fulfill our list maintenance responsibilities. Please refer to the July Response and Annual Report for information on those steps, and their effectiveness.

Specific responses to your questions relating to the Election Administration and Voting Survey 2024 Comprehensive Report (EAVS Report) are as follows:

1. **In the EAVS data for Question A3d, Pennsylvania identified 378,187 voters (4.49 percent) with duplicate registrations, nearly three times below the nationwide average of 12.7 percent. Moreover, we understand the Public Interest Legal Foundation recently identified an additional 19,489 registrants holding matched voter registration files in second states as of Summer 2025, 3,170 instances of same-address duplications, 70 intra-county duplicates, and 321 placeholder/fictitious dates of birth. Please explain why duplicate registrations are such a low percentage of the total registration applications received.**

Question 1 includes figures that are contradicted by the EAVS Report, and your framing misrepresents the data reported in EAVS Survey question A3d. The EAVS Report shows that the 378,187 duplicate registration applications reported represent ***9.4%*** of the total number of registration applications reported, not ***4.49%***, as your letter states.[4] Moreover, the EAVS Report itself qualifies the national average figure, noting that "[t]he percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation," meaning that states with less reported data were consequentially not included in the calculation.[5] Further, many of the states reporting data suggested that their numbers may be incomplete or underinclusive.[6] That 12.7% "nationwide average" number is presumably derived from adding all duplicates and dividing by all transactions.[7] Given that this does not weight states differently based on their population, it may not serve as a reliable interstate comparison. Indeed, comparing the number of duplicate

---

[3] 25 Pa.C.S. § 1203. Of course, the NVRA specifically contemplates that local governments may have a role in the electoral process. 52 U.S.C. §§ 20501; 20507(j).

[4] *See* EAVS Report, pg. 176, *accessible at* https://www.eac.gov/sites/default/files/2025-06/2024_EAVS_Report_508c.pdf.

[5] *Id.* at 177 (Table 3 General Notes).

[6] *See, e.g., id.*, at 177 n.2 (at least one Arizona county did not track duplicate applications caught and rejected).

[7] *Id.* at 177 (Table 3 General Notes) (noting the nationwide total is "casewise").

2

registrations nationwide to the total of all applications nationwide, the nationwide average of duplicates is closer to 6%.

Critically, however, the data reported in Table 3 does not represent "voters....with duplicate registrations," as it is phrased in your letter. Rather, Question A3d asks for "Registration transactions submitted by persons already registered to vote at the same address, under the same name and personal information (e.g., date of birth, social security number, driver's license), and with the same political party (where applicable)."[8] It is a measure of applications submitted, not a measure of duplicate voters on the rolls. All states have an incentive to prevent duplicate applications from being submitted in the first place, as they unnecessarily pose additional burdens for elections staff to process (and then properly deny them). Indeed, Pennsylvania agrees with the observation of our colleagues from Oklahoma that "[t]he introduction of online voter registration has greatly reduced the occurrence of duplicate, rejected, and invalid voter registrations."[9] Permitting voters to check their registration status *before* they submit their application cuts down on duplicate submissions.

To understand the work that Pennsylvania does to remove duplicate voters who may be on our rolls, as opposed to those who apply and are denied as duplicate, please refer to the Department's Annual Report.[10]

 2. **Similarly, in the EAVS data for Question A12h, 47 of 66 counties in Pennsylvania recorded either 0 or 1 transactions to remove duplicate registrants. Please confirm how frequently county personnel perform manual duplicate queries and how frequently SURE performs automated searches.**

Again, the removal of potential duplicate registrations (addressed in A12h) is different from the denial of duplicate applications (addressed in A3d). In addition, Pennsylvania has 67 counties, not 66.

The Department's response to A12h is consistent with our efforts to prevent duplicate registrations by having counties appropriately screen registration applications, as opposed to removing duplicate registrations during list maintenance activities. Moreover, since 2020, the Department has participated in the Electronic Registration Information Center's (ERIC) duplicate program, which allows for a systemic duplicate review. The Department's efforts to remove duplicate registrations in collaboration with ERIC—including efforts made prior to the reporting period at issue in the 2024 EAVS Report—mean that there will be fewer duplicate

---

[8] EAVS Survey at 7, *accessible at* https://www.eac.gov/sites/default/files/2024-04/2024_EAVS_FINAL_508c.pdf.

[9] EAVS Report, fn. 4, *supra*, at 178 n.11.

[10] You also reference potential duplicates identified by a nongovernmental entity. The Department will be reaching out to review the data purportedly identified by that entity. Critically, the lack of personally identifiable information (PII) in the dataset used by this entity, and the fact that the referenced letter does not specify whether these records are active or inactive, make it difficult to evaluate their claims at this time. The Department is confident that any duplicate registrations will be identified through regular list maintenance processes.

removals in this and subsequent EAVS reports. Indeed, as we noted in our Annual Report, "[t]he number of potential duplicate voter registrations has decreased by more than 80% since Pennsylvania started using this ERIC data in 2020, demonstrating the effectiveness of this program over time."[11]

Finally, as noted previously, the county voter registration commissions have significant autonomy and are not subject to the direct control of the Department.

> **3. In the EAVS data for Question A3g, Pennsylvania listed 40,209 transactions as "other," without further explanation. Please explain those registrations listed as "other."**

This question misrepresents DOS' response to A3g. To the contrary, the EAVS Dataset available on the Election Assistance Commission's website[12] shows that the Department noted that the 40,209 transactions enumerated in A3g represented pending applications. This was one of the "most cited" descriptions for the "Other" category.[13]

> **4. In the EAVS data for Question A4h, Pennsylvania listed 1 transaction arising from an Armed Forces Recruitment Office, which is significantly below similarly sized states. Please explain why such few transactions can be sourced to Armed Forces Recruitment Offices and what actions Pennsylvania is taking to ensure Offices fulfill their voter registration responsibility.**

Many states reported 0 or no applications received via recruitment offices presumably because Department of Defense Instruction 1000.04 directs recruitment centers to report voting assistance metrics to the Federal Voter Assistance Program (FVAP) and not individual states.[14] And while recruitment centers are NVRA agencies, the Department is nevertheless without authority to require reporting of metrics by recruitment centers.

> **5. In the EAVS data for Question A11, concerning the reason for sending confirmation notices, the largest category by far is A11n, "Other." Please explain the nature of these confirmation notices and why they do not fit in available categories.**

As elaborated in the EAVS Dataset, the figure reported in A11n corresponds to "the number of confirmation notices sent due to correspondence sent by an election office being returned as undeliverable or due to failure of the voter to respond to an initial confirmation notice sent for the reason identified in a111 (initial NCOA notice)." This number may be larger than any other

---

[11] Annual Report at 18, *accessible at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/reports/voter-registration/dos_voter_registration_report_2024_final.pdf.
[12] https://www.eac.gov/sites/default/files/2025-06/2024_EAVS_for_Public_Release_V1_xlsx.xlsx
[13] EAVS Report, fn. 4, *supra* at 132.
[14] DoDI 1000.04, Federal Voting Assistance Program (FVAP), November 12, 2019

4

individual mailing because it is sent following nonresponse to a variety of prior list maintenance correspondence types.

### 6. In the EAVS data, Pennsylvania has failed to respond to Question A13a regarding merged voter records. Please provide the requested data or an explanation for why that information is not available.

The Department did, in fact, respond to Question A13a. Specifically, the Department noted that the data was not available and further explained in the comments to A13a that "the Pennsylvania Department of State is unable to provide a figure for A13a due to an inability to accurately differentiate between merged records and transferred records."

You also posed questions regarding removal procedures for certain categories of voters. Nothing in the NVRA provides a process by which those who are deemed non-eligible on the basis of being a non-citizen are to be removed from the voter rolls. As set forth in the July Response, false statements misrepresenting an applicant's citizenship on a voter registration form are crimes punishable under both state[15] and federal laws.[16] To the extent any county registration commission or the Department becomes aware that an individual who is not a U.S. citizen has registered or attempted to vote, where appropriate, the county may cancel such registration and refer the matter to law enforcement for handling.

Finally, with respect to removal of voters by reason of criminal conviction or mental capacity, the NVRA does not govern; rather, it defers to state law.[17] Under Pennsylvania law, there is no basis or procedure to challenge, revoke or cancel a person's voter registration on the basis of an adjudication of mental incompetency. As for those voters with felony convictions, there is no removal process contemplated by Pennsylvania law, as explained in the July Response.

\*   \*   \*

As Pennsylvania's chief election official, I take seriously my legal obligation to ensure that all eligible voters have access to the ballot here in the Commonwealth and the responsibilities that both federal and state law impose on the Department and on our county election officials to faithfully maintain our voter rolls. Likewise, I applaud efforts at transparency in our voting processes, such as the EAVS Survey data reporting. Pennsylvania goes further than is required, detailing our voter registration and list maintenance processes in our Annual Report. The Department and Pennsylvania's 67 counties engage in reasonable efforts to ensure that our voter

---

[15] 25 Pa.C.S. §§ 1703 (providing for a fine up to $10,000 and five years in prison for improper registration), 1714 (incorporating criminal penalty provisions of the Crimes Code at 18 Pa.C.S. §§ 4902, 4903, and 4904) relating to perjury, false swearing, and unsworn falsification to authorities).

[16] 18 U.S.C. §§ 1015(f) (imposing fines and up to five years in prison for misrepresenting one's citizenship on a voter registration application), 3559 and 3571 (setting fines at $250,000 for class D felonies).

[17] 52 U.S.C. § 20507(a)(3)(B).

5

rolls are accurate and that all requirements of Pennsylvania and federal law are faithfully followed. Please let us know if you have any further questions.

Sincerely,

*[signature]*

Al Schmidt
Secretary of the Commonwealth

Enclosure (without appendices)