# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF PENNSYLVANIA;<br>and AL SCHMIDT, in his official capacity as<br>Secretary of the State of Pennsylvania,<br><br>     Defendants. | Case No. 2:25-cv-1481<br>(Hon. Cathy Bissoon) |

**BRIEF IN SUPPORT OF JOINDER AND MOTION TO DISMISS OF NICHOLAS MASTON, GREGORY PERRY, TODD THATCHER, JOEL DICKSON, TRISHA KENT, LIOR STERNFELD, JOHN THOMPSON, THE LEAGUE OF WOMEN VOTERS OF <u>PENNSYLVANIA, AND COMMON CAUSE</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ............................................................................................... 3

   A.   The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data ............ 3

   B.   The United States Seeks to Unlawfully Construct National Voter Database with the Data 6

   C.   The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters ...............11

III.   ARGUMENT ...................................................................................................... 13

   A.   The CRA Claim Can be Dismissed Because the United States has Failed to State the
        *Actual* Purpose for its Request for Pennsylvania Voters' Data.................................... 15

IV.   CONCLUSION.................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
No. 25-cv-596 (D. Md. Jan. 16, 2026) ................................................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 13

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ................................................................................. 14

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ............................................................................................... 16

*Federal Deposit Insurance Corporation v. Wentz*,
55 F.3d 905 (3d Cir. 1995) .................................................................................... 15

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ...................................................................... 14

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................................................................................. 14

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ............................................................................................... 16

*PA Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) ..................................................................... 7

*Sugarloaf Funding, LLC v. United States Department of Treasury*,
584 F.3d 340 (1st Cir. 2009) .................................................................................. 15

*Tincher v. Noem*,
No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) ..................................... 12

*Torrens v. Lockheed Martin Services Group, Inc.*,
396 F.3d 468 (1st Cir. 2005) .................................................................................. 17

*Town of Sanford v. United States*,
140 F.3d 20 (1st Cir. 1998) .................................................................................... 17

*United States v. Oregon*,
No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026) .................................................... 1

*United States v. Weber*,
No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ......... 1, 14, 16, 18

## Statutes

5 U.S.C. § 552a ......................................................................................................... 16
52 U.S.C. § 20501 ..................................................................................................... 11
52 U.S.C. § 20507 ............................................................................................... 15, 17
52 U.S.C. § 20701 ............................................................................................... 13, 14
52 U.S.C. § 20703 ............................................................................................. 2, 14, 15
52 U.S.C. § 21083 ..................................................................................................... 11
52 U.S.C. § 21085 ................................................................................................ 11, 17

## Other Authorities

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html 7

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ............................................................................................... 7, 8

Bethany Rogers, *Testimony: Pa. Election Denial Group Behind Voter Registration Cancellation Form Mailings*, GOERIE.COM (Nov. 2, 2024), https://www.goerie.com/story/news/politics/elections/state/2024/11/02/pa-voter-registration-cancellation-letters-chester-county/75996247007 ..................... 9

Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024), https://www.wesa.fm/politics-government/2024-09-28/pa-fair-elections-conservative-pennsylvania-voter-role-purges .......... 8

Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LANCASTERONLINE (July 21, 2024), https://lancasteronline.com/news/politics/pa-election-integrity-groupmet-with-2-architects-of-2020-effort-to-overturnelection/article_d477633c-460f-11ef-9d56-2fd754d57cab.html .................................. 8

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 ................................................. 8, 9

Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT (Feb. 12, 2025), https://www.votebeat.org/pennsylvania/2024/02/12/heather-honey-pennsylvania-election-integrity-eric/ ......................................................................................................................... 8

Chester County, *Nov. 1, 2024 Election Board* overview *Hearing,* https://chestercopa.portal.civicclerk.com/event/852/ ................................................................ 9

December 5, 2025 Post by @AAGDhillon, https://perma.cc/8GE8-Q53H ................................ 10

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. .............. 6

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6... 7

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ................................................................................................................................ 6

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E ................................................. 8

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post .......................................................................... 7

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ ............................................................................. 8

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ... 6

Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ .................................... 12

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 ............................................. 7

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens. ....................................................................................... 10

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ ..................................................................................................... 4

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, Politico, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245 ......................................................................................................... 10

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters ................................................................................ 7

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025), https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting ............................................................................................................. 9

Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5 .................................................................... 5

Press Release, United States Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026), https://perma.cc/YCM2-QQKM ....................................................................... 5

Press Release, United States Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ..................................... 5

Press Release, United States Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B .................................................................................................. 5

Press Release, United States Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC ......................................................................... 5

Press Release, United States Department of Justice,
*Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls*
(Dec. 2, 2025), https://perma.cc/F5MD-NWHD ..................................................................... 5

Press Release, United States Department of Justice,
*Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA ..................................................................... 5

*Read Bondi's Letter to Minnesota's Governor*, N.Y. Times (Jan. 24, 2026),
https://perma.cc/H5GY-ZKBS ..................................................................... 12

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025,
https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09 ..................................................................... 6

United States Department of Justice, Civil Rights Division,
*Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021),
https://perma.cc/74CP-58EH ..................................................................... 3

**Rules**

Fed. R. Civ. P. 12 ..................................................................... 1, 13

Nicholas Maston, Gregory Perry, Todd Thatcher, Joel Dickson, Trisha Kent, Lior Sternfeld, John Thompson, the League of Women Voters of Pennsylvania, and Common Cause (collectively, the "Maston Intervenors" or the "Voter Intervenors") submit this brief in support of their Joinder and Motion to Dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

This Court recently granted the Voter Intervenors' motion to intervene as defendants in this action.  Motions to dismiss have been filed by Secretary Schmidt and by the other intervenor-defendants, and the Voter Intervenors hereby join in those motions.  *See* Br. of Sec. Schmidt in Support of his Mot. to Dismiss ("Sec. Schmidt MTD"), Dkt. No. 92; Mem. in Support of Mot. to Dismiss ("NAACP MTD"), Dkt. No. 90-2; Pa. Alliance for Retired Americans' Mem. in Support of Mot. to Dismiss ("PARA MTD"), Dkt. No. 88-3.  As set forth therein, the United States' claims under the Help America Vote Act ("HAVA"), the National Voter Registration Act ("NVRA"), and Title III of the Civil Rights Act of 1960 ("CRA") are legally deficient in multiple ways, and the relief the United States seeks violates federal law.  Indeed, a district court in California reached those same conclusions just last week with respect to a materially identical complaint against the State of California, dismissing the United States's claims without leave to replead.  *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also* Minutes of Proceedings, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), Dkt. No. 68 (granting dismissal of the United States's claims with written opinion to follow).  This Court should do the same.

In granting intervention, this Court stated that the Voter Intervenors may seek leave to file their own motion to dismiss if they "determine that their arguments are not sufficiently addressed in the other MTDs."  Order, Dkt. No. 105. While the existing motions are comprehensive and provide multiple sufficient grounds for the dismissal of all of the United States's claims, there are

additional grounds for dismissal of the United States's CRA claim that are not sufficiently addressed in those motions.

The CRA claim can be dismissed for failure to properly disclose "the basis and the purpose" of the United States' demand for the disclosure of sensitive personal voter data. 52 U.S.C. § 20703. As the existing motions make clear, the United States has facially failed to comply with that statutory requirement, because it has stated no "basis" whatsoever for its request, and because its stated "purpose" is not plausibly advanced by obtaining the unredacted voter information at issue. In addition, and set forth below in detail, the CRA claim can also be dismissed because judicially noticeable documents and public reporting make plain that the United States's stated purpose (even it were sufficient on its face) is pretextual, and that the United States still has not disclosed the *actual* purpose of its requests, as required by the CRA. *See* 52 U.S.C. § 20703 (United States must disclose "*the* basis and *the* purpose" of request) (emphasis added)). These documents and reporting indicate that the United States' actual reason for the data demand is to create an unauthorized and unlawful national database, and to use this illicit tool to target and challenge voters in coordination with so-called "election integrity" advocates who have sought to overturn elections in Pennsylvania and elsewhere.

For Voter Intervenors in particular, this unlawful purpose strikes close to home. On the eve of the 2024 Presidential Election, thousands of Pennsylvania voters, including Mr. Maston, Mr. Perry, Mr. Thatcher, Mr. Dickson, and Ms. Kent, were subjected to baseless mass challenges to their mail-in ballots. This coordinated effort to disenfranchise eligible voters, led by purported election integrity activists, was premised on faulty database matching techniques using publicly available voter registration data. These Voter-Intervenors—who were anxious and furious at this attempted infringement on their rights—attended Board of Elections hearings and submitted

written statements to defend their qualifications to vote in Pennsylvania.  Now, the Department of Justice is seeking unprecedented access to highly sensitive voting data about these voters and millions more like them, demanding personally identifying information including social security numbers and drivers' license numbers, apparently in an effort to supercharge the wrongful disenfranchising conduct from the 2024 election and give it the imprimatur of the federal government.

The CRA, the NVRA, and HAVA were enacted for the purpose of ensuring that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. Title III of the CRA, for example, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).  The United States' demand for Pennsylvania's unredacted voter file, and the sensitive, protected personal information of millions of Pennsylvania voters, undermines these statutes' core purposes and is contrary to law.  The Complaint should be dismissed.

## II.    BACKGROUND

The relevant background facts are recounted in the other motions to dismiss, and are set forth here only as necessary to provide context for the additional grounds for dismissal advanced in this motion.  *See* Sec. Schmidt MTD at 2-7; NAACP MTD at 2-6; PARA MTD at 3-6.

### A.    The United States Seeks to Force the Disclosure of Voters' Sensitive Voter Data

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data

from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ.

On June 23, 2025, DOJ wrote to Defendant Secretary Al Schmidt requesting information about voter registration and maintenance of voter rolls in Pennsylvania. *See* Compl. ¶¶ 33-34; *see also* Letter of Maureen Riordan to the Hon. Al Schmidt (June 23, 2025), Dkt. No. 37-1. In particular, DOJ expressed an interest in certain categories of voters, including: voters who might have "duplicate" records in the system for some reason (for example, because they changed addresses and registered to vote at their new address); "voters who have been convicted of a felony;" voters "who have moved outside the Commonwealth" and registered in their new state (even if those voters subsequently moved back to Pennsylvania); voters who are supposedly "ineligible to vote due to non-citizenship;" and voters who "registered to vote by mail." *Id.* at 2. Secretary Schmidt provided detailed responses to the June 23 requests in a heavily footnoted, 11-page letter. *See* Letter of Al Schmidt to Maureen Riordan (July 23, 2025), Dkt. No. 37-2.

The United States responded by demanding that Secretary Schmidt provide "[t]he current electronic copy of the Commonwealth of Pennsylvania's computerized statewide voter registration list" with "all fields contained within the list." Compl. ¶¶ 33-34; Letter of Deputy Attorney General Michael Gates to the Hon. Al Schmidt (Aug. 4, 2025), Dkt. No. 37-3. This August 4 letter again asked about voters with supposed "duplicate registrations," as well as supposed "[n]on-citizen" voters and voters with a "[f]elony conviction." *Id.* at 2. The August 4 letter purported to demand this information "[p]ursuant to Section 20507(i) of the NVRA." *Id.* at 1.

Ten days later, the United States again demanded sensitive Pennsylvania voter data, specifying that "the statewide VRL [voter registration list]… must… contain[] *all fields*, which

includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number [SSN4s]." Letter of Assistant Attorney General Harmeet Dhillon to the Hon. Al Schmidt (Aug. 14, 2025) ("August 14 Letter"), Dkt. 37-4; *accord* Compl. ¶ 39. This August 14 Letter for the first time invoked Title III of the Civil Rights Act of 1960 as one source of purported authority for the demand and stated, with respect to the invocation of Title III, "the purpose of the request is to ascertain Pennsylvania's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 3.

In subsequent letters, Secretary Schmidt answered the questions posed by the United States and offered to provide the United States a copy of Pennsylvania's voter registration list ("Full Voter Export" or "FVE"), but declined to include in the FVE certain confidential, sensitive data, including voters' driver's license numbers and SSN4s. Compl. ¶ 43; Letter of Al Schmidt to Michael Gates (Aug. 18, 2025), Dkt. No. 37-5; Letter of Al Schmidt to AAG Dhillon and DAAG Gates (Aug. 21, 2025), Dkt. No. 37-6.

The United States responded by filing this lawsuit—one of at least twenty-five suits nearly identical lawsuits that DOJ has initiated against states and election officials—seeking to compel the production of this sensitive Pennsylvania voter data.[1]

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

**B.    The United States Seeks to Unlawfully Construct National Voter Database with the Data**

According to extensive public reporting, DOJ's requests for private, sensitive voter data from Pennsylvania and other states appear to be in connection with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize state voter rolls.

According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://perma.cc/CN2T-RJU9.  DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://perma.cc/L39A-S5VZ .

---

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed election integrity advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states (including Pennsylvania) and now serves as DHS's "deputy assistant secretary for election integrity."[3] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[4] These actors and their associates have previously sought to compel Pennsylvania to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in Pennsylvania. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by "PA Fair Elections," a group affiliated with current

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

[4] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://perma.cc/E87D-XDRX; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[5]

For example, in the months before the 2024 election, Honey and her affiliated organization PA Fair Elections pushed an effort to remove thousands of lawful Pennsylvania voters from the rolls, based on faulty sources of voter data such as "Eagle AI," a voter database analysis tool supported by Mitchell and her Election Integrity Network.[6] Then, on the eve of the 2024 election, over 4,000 Pennsylvania voters were subjected to mass-challenges lodged by individuals affiliated with PA Fair Elections.[7] Public reporting and contemporaneous hearing testimony from county boards of elections confirmed that PA Fair Elections helped facilitate these challenges, which were based on self-evidently flawed attempts to analyze and match data from the Pennsylvania voter

---

[5] *See, e.g.*, Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT (Feb. 12, 2025), https://perma.cc/HQ9C-TMT7 (discussing Honey's "false" claims regarding voting in Pennsylvania in 2020 and her extensive collaboration with Mitchell); *see also* Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LANCASTERONLINE (July 21, 2024), https://perma.cc/K92T-L288 (describing Mitchell meeting with PA Fair Elections).

[6] *See* Brett Sholtis, *'PA Fair Elections,' Tied to Powerful Conservative Groups, Pushes to Remove People from Voter Rolls*, WESA (Sept. 28, 2024), https://perma.cc/8FNC-5KH9; *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA (July 13, 2024), https://perma.cc/4MEZ-82SF ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[7] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E  (same).

database with external sources.[8]  The baseless voter challenges, which were filed in at least twelve counties across the Commonwealth and which targeted five of the Voter Intervenors among thousands of Pennsylvanians, were eventually all rejected.  *See, e.g.*, Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5; *see also* Decl. of Nicholas Maston ("Maston Decl.") ¶¶ 8-13, Dkt. No. 36-2; Decl. of Gregory Perry ("Perry Decl.") ¶ 9-11, Dkt. No. 36-3; Decl. of Todd Thatcher ("Thatcher Decl.") ¶¶ 9, 10, Dkt. No. 36-4; Decl. of Joel Dickson ("Dickson Decl.") ¶¶ 8-14, Dkt. No. 36-5; Decl. of Trisha Kent ("Kent Decl.") ¶¶ 11-13, Dkt. No. 36-6.

The United States took up these efforts to use novel and unspecified forms of data analysis to scrutinize state voter data and target voters for potential disenfranchisement after the new Administration took office.  According to public reporting, as part of those efforts DOJ asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[9] DOJ officials have since claimed that "we've checked 47.5 million voting records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting

---

[8] *E.g.*, Bethany Rogers, *Testimony: Pa. Election Denial Group Behind Voter Registration Cancellation Form Mailings*, GOERIE.COM (Nov. 2, 2024), https://www.goerie.com/story/news/politics/elections/state/2024/11/02/pa-voter-registration-cancellation-letters-chester-county/75996247007.  Notably, the challenger in Chester County, who baselessly challenged Intervenors Thatcher and Dickson's ballots, testified under oath about PA Fair Elections' involvement in her effort.  Chester County, *Nov. 1, 2024 Election Board Hearing* at 50:30-51:34; 58:00-58:47; 1:54:58-1:55:19, https://chestercopa.portal.civicclerk.com/event/852/media.

[9] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR (May 22, 2025), https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

indicates that these efforts are producing false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[10]

A recent federal court filing by DOJ further corroborates how United States officials have been seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques, and have been working with outside "election integrity" advocates seeking to deny election results in those efforts. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration (SSA):

> SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, Politico, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

---

[10] December 5, 2025 Post by @AAGDhillon, https://perma.cc/8GE8-Q53H; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

### C.   The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters

Additional federal government documents indicate how that the United States ultimately plans to use voters' sensitive personal data: to assert control over voting eligibility in the states, to order the disenfranchisement of voters, and potentially to contest the results of state-run elections.

In connection with its requests for states' voter data, the United States has begun asking states to execute a memorandum of understanding ("MOU") describing how the data will be used. *See* Ex. A, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"); *see also* Ex. B, Dec. 4 Transcript Excerpts from *United States v. Weber*, No. 25-cv-09149, at 72–73, 90 (DOJ attorney discussing MOU).  The terms of the MOU purport to vest the United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and then to compel states to remove these voters from the rolls, depriving them of the franchise.

The NVRA and HAVA give states the responsibility of conducting a "reasonable effort" to maintain voter lists and remove actually ineligible voters from the rolls.  52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A). The particular procedures developed for complying with HAVA's requirement to maintain a centralized voter file are thus "left to the discretion of the State."  52 U.S.C. § 21085. Moreover, the NVRA builds in significant protections for voters, requiring that, once identified, certain potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake. *Id.;* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of protecting and expanding the right to register to vote and participate in democracy.  *E.g.*, 52 U.S.C. § 20501.

The terms of the MOU, however, purport to place authority to identify supposed ineligible voters in the hands of the federal government.  MOU at 2, 5.  The MOU makes DOJ a "Custodian" of the state's voter file, and provides that DOJ will analyze the file and identify "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice

Department found when testing, assessing, and analyzing your state's [voter list] for NVRA and HAVA compliance, i.e., that your state's [voter list] only includes eligible voters." MOU at 4-5. And under the MOU's terms, once federal officials identify supposed "ineligible voters," states would be required to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis, MOU at 5. These removals would be required under the terms of the MOU notwithstanding the procedural protections afforded to voters by the NVRA, including the statute's firm bar on systematic removals of voters within 90 days of an election, 52 U.S.C. § 20507.[11]

In short, extensive public reporting, including government documents created by the DOJ and DOJ officials' own statements and admissions, indicate that the United States's aim in seeking sensitive voter data on millions of Americans is to turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states. And recent events have further highlighted the extremely abnormal nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[12] The letter purports to set out three actions that Minnesota—which is one of the states DOJ has sued to try to obtain sensitive voter data—should take to "restore the rule of law, support ICE officers, and bring an end to the

---

[11] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

[12] *Read Bondi's Letter to Minnesota's Governor*, N.Y. Times (Jan. 24, 2026), https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

chaos in Minnesota," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[13]

## III.    ARGUMENT

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When considering a motion to dismiss, a court need not accept the complaint's legal conclusions.  *Id.*  A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

The motions to dismiss filed by Secretary Schmidt and the other intervenor-defendants set forth numerous independently sufficient grounds to dismiss the complaint here.  The Voter Intervenors offer one more, relating to the United States' claim under Title III of the CRA.

By way of background, Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians.  52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of

---

[13] Bondi Letter at 2, 3.

such custodian by the Attorney General or [her] representative." *Id.* § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphasis added).[14]

Consistent with the statutory text, contemporaneous case law immediately following the enactment of Title III of the CRA treated "the basis" and "the purpose" as two related, but distinct, concepts. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The "basis" is the statement of *why* the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains *how* the requested records would help the Attorney General ultimately determine if there is, in fact, a violation of the law. *E.g.*, *Kennedy* 306 F.2d at 229 n.6.

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. It prevents the statute from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *Id.* The statutory basis-and-purpose requirement therefore is not perfunctory but requires a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. That is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of whether federal demands for records are enforceable includes an evaluation of whether the underlying investigation is "conducted pursuant to a legitimate purpose," *Sugarloaf*

---

[14] Voter Intervenors assume for purposes of this motion that the statewide electronic voter file may constitute a "record" or "paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" that has "come into [the Secretary's] possession. 52 U.S.C. § 20701. However, no court has ever addressed the question.

14

*Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (citing *United States v. Powell*, 379 U.S. 48, 57 (1964)); *see also, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (information sought pursuant to an administrative subpoena must be relevant to the inquiry and not unduly burdensome).

Here, and as detailed in the other defendants' motions, the United States simply has not stated *any* "basis" for its demand at all, either in the Complaint or in the August 14 Letter in which DOJ first invoked Title III. *See, e.g.*, Sec. Schmidt MTD at 21; NAACP MTD at 15; PARA MTD at 13. The failure to set forth any "basis" for the demand is sufficient grounds for dismissal of this action. *See Weber*, 2026 WL 118807, at *9. Moreover, the United States has failed to plausibly plead that it has stated the "purpose" of its request, because a copy of Pennsylvania's unredacted voter file from a single point in time cannot assist DOJ in examining whether Pennsylvania is complying with its obligations under the NVRA and HAVA to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507. *See* Sec. Schmidt MTD at 10-13, 16-19; *see also* PARA MTD at 14-15.

However, even if the United States had plausibly set forth some facially sufficient statement of the basis and the purpose for its request related to compliance with those statutes (and again, it did not), the CRA claim would also be subject to dismissal because DOJ's stated reason for requesting the sensitive personal data of millions of Pennsylvania voters is pretextual.

### A. The CRA Claim Can be Dismissed Because the United States has Failed to State the *Actual* Purpose for its Request for Pennsylvania Voters' Data

Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. 52 U.S.C. § 20703 (emphasis added). By twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying

the request.  *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article).  But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one.  *Weber*, 2026 WL 118807, at *10.

Public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, DOGE-inspired forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* 6-13 & nn.2-13. As the *Weber* court characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database."  2026 WL 118807, at *10.

This unstated purpose, which is being carried out in conjunction with "election integrity" advocates who have previously attacked Pennsylvania's elections, is eerily similar to the unlawful mass-challenges that violated the rights of Voter Intervenors and thousands of other Pennsylvanians in 2024.  *See supra* 8-9 & nn.7-8.  The creation of a national voter database— much less one designed for targeting and mass-challenging voters—has never been authorized by Congress, and would violate (among other provisions of federal law) the federal Privacy Act's prohibition on the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote.  *See* 5 U.S.C. § 552a(e)(7).

16

Now consider the MOU that the United States has recently sought for states to sign in connection with its requests for statewide voter files. *See supra* 11-12. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, this MOU runs directly afoul of those statutes.[15] For one, the MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." *Id.* § 21085; MOU at 2, 5. In addition, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the firm bar against systematic voter removals within 90 days of an election. 52 U.S.C. § 20507. The MOU confirms that DOJ's stated purpose of ensuring compliance with the NVRA and HAVA is not accurate or plausible, and that its actual purpose for seeking to ingest the sensitive personal information of millions of Pennsylvania voters involves defying those statutes and the procedural protections they afford in order to unlawfully centralize control over state voter rolls in the hands of the federal executive.

And now consider the Attorney General's recent letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data in order to help "support ICE officers" and "bring an end to the chaos" being inflicted on the civilian population there by DHS agents ostensibly tasked with enforcing the immigration laws. *See supra* 12-13. Bondi's letter, purporting to connect DOJ's request for state voter data with the Administration's draconian immigration-

---

[15] This Court can take judicial notice of the MOU as a government document produced by DOJ. *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *see also, e.g.*, *Town of Sanford v. United States*, 140 F.3d 20, 22 (1st Cir. 1998).

enforcement efforts, further highlights DOJ's failure to disclose the true purpose of the request here.

The United States' failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state *the true purpose* for the demand for Pennsylvanian's protected personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12.

## IV.    CONCLUSION

The United States' Complaint should be dismissed.

Dated: January 28, 2026                                                        Respectfully submitted,


                                                                /s/ *Ari J. Savitzky*

Mary M. McKenzie (PA No. 47434)**            Ari J. Savitzky*
Benjamin Geffen (PA No. 310134)**            Theresa Lee*
Olivia Mania (PA No. 336161)**               Sophia Lin Lakin*
PUBLIC INTEREST LAW CENTER                   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
1500 JFK Blvd., Suite 802                     125 Broad Street, 18th Floor
Philadelphia, PA 19102                        New York, NY 10004
(267) 546-1313                                Tel.: (212) 549-2500
mmckenzie@pubintlaw.org                       asavitzky@aclu.org
bgeffen@pubintlaw.org                         tlee@aclu.org
omania@pubintlaw.org                          slakin@aclu.org

                                              Witold J. Walczak (PA No. 62976)
                                              Kate I. Steiker-Ginzberg (PA No. 332236)
                                              AMERICAN CIVIL LIBERTIES UNION OF
                                              PENNSYLVANIA
                                              P.O. Box 60173
                                              Philadelphia, PA 19102
                                              (215) 592-1513
                                              vwalczak@aclupa.org

ksteiker-ginzberg@aclupa.org

\* *admitted pro hac vice*

\*\* *attorney admission pending*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, a true and correct copy of the foregoing document

was served via the Court's ECF system on all counsel of record.

/s/ *Ari J. Savitzky*

# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

---

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.    PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:


The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II.    AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq*.

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states.  The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law.  In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact   of the issues to assist your state with curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.    TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized.  This process guarantees that users can only access files and folders only where they have permission.  Users are also limited to the authorized type of interaction with each file or folder.  Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use.  The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a.  The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017).  It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes.  The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records.  Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

4

the stored information.  However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.   NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.   CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data.  Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

5

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage.  In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

6

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X.  LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI.  DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1.  Destroy all hard copies containing confidential data (e.g., shredding);

2.  Archive and store electronic data containing confidential information offline in a secure location; and

3.  All other data will be erased or maintained in a secured area.

## XII.   OTHER PROVISIONS.

A.  Conflicts. This MOU constitutes the full MOU on this subject between the Department
and your state. Any inconsistency or conflict between or among the provisions of this
MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other
documents incorporated by reference in this MOU (e.g., transaction charges).

B.  Severability. Nothing in this MOU is intended to conflict with current law or regulation
or the directives of Department, or the your state. If a term of this MOU is inconsistent
with such authority, then that term shall be invalid but, to the extent allowable, the
remaining terms and conditions of this MOU shall remain in full force and effect.

C.  Assignment. Your state may not assign this MOU, nor may it assign any of its rights or
obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the
benefit of, and be binding upon, any successors to the Justice Department and your state
without restriction.

D.  Waiver. No waiver by either party of any breach of any provision of this MOU shall
constitute a waiver of any other breach. Failure of either party to enforce at any time, or
from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E.  Compliance with Other Laws. Nothing in this MOU is intended or should be construed to
limit or affect the duties, responsibilities, and rights of the User Agency under the National
Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote
Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et
seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F.  Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents,
and the drafts and communications leading up to the execution of this MOU are deemed

8

by the parties as "confidential." Any disclosures therefore could be made, if at all, pursuant to applicable laws or court orders requiring such disclosures.

**SIGNATURES**

VRL/Data Provider
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

Requester
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)


| UNITED STATES OF AMERICA, | ) CASE NO: 2:25-cv-09149-DOC-ADSx |
|---|---|
| | ) |
| Plaintiff, | ) CIVIL |
| | ) |
| vs. | ) Los Angeles, California |
| | ) |
| SHIRLEY WEBER, ET AL, | ) Thursday, December 4, 2025 |
| | ) ( 7:38 a.m. to  9:09 a.m.) |
| Defendants. | ) (12:01 p.m. to 12:58 p.m.) |
| | (  2:00 p.m. to  2:31 p.m.) |
| | (  2:31 p.m. to  2:33 p.m.) |

HEARING RE:

MOTION TO DISMISS [DKT.NO.67];

PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
(52 USC 20701)
[DKT.NOS.87,88,89]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:              SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Karlen Dubon


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:


For Plaintiff:              ERIC V. NEFF, ESQ.
                            U.S. Department of Justice
                            150 M St. NE, Suite 8-139
                            Washington, DC 20002
                            202-532-3628


For Intervenors:            GRAYCE S.P. ZELPHIN, ESQ.
                            American Civil Liberties
                            Union of Northern California
                            39 Drumm Street
                            San Francisco, CA 94111
                            530-515-8978

                            CHRISTOPHER D. DODGE, ESQ.
                            Elias Law Group
                            250 Massachusetts Ave. NW
                            Suite 400
                            Washington, DC 20001
                            202-987-4928


For Robert Page:            SUZANNE E. SHOAI, ESQ.
                            Orange County Counsel
                            P.O. Box 1379
                            Santa Ana, CA 92702
                            714-834-3300


For Defendants:             MALCOLM A. BRUDIGAM, ESQ.
                            Office of the Attorney General
                            1300 I Street
                            Suite 125
                            Sacramento, CA 95814
                            916-210-7873

                            ROBERT W. SETRAKIAN, ESQ.
                            California Department of Justice
                            300 S. Spring Street
                            Suite 1702
                            Los Angeles, CA 90013
                            213-269-6668

3

| | |
|---|---|
| 1 | **Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE COURT:** -- Shirley Weber. |
| 4 | **(Pause)** |
| 5 | **THE COURT:** And, counsel, as you're seated, let me |
| 6 | take one more matter. Just remain seated for a moment. |
| 7 | **(Pause)** |
| 8 | **THE COURT:** All right. Thank you then. I think that |
| 9 | resolves the rest of the morning calendar. So first of all, |
| 10 | good morning. |
| 11 | **MR. NEFF:** Good morning, Your Honor. |
| 12 | **THE COURT:** This is the matter of United States v. |
| 13 | Shirley Weber. It's case number 25-09149. And, counsel, you |
| 14 | can just remain seated. You can pretend it's state court if |
| 15 | you want to, but make your appearances. |
| 16 | **MR. NEFF:** Eric Neff on behalf of the United States. |
| 17 | Good morning, Your Honor. |
| 18 | **THE COURT:** Thank you. |
| 19 | **MR. BRUDIGAM:** Deputy Attorney General Malcolm |
| 20 | Brudigam on behalf of defendants Secretary of State Shirley |
| 21 | Weber and the State of California. |
| 22 | **THE COURT:** Okay, thank you very much. |
| 23 | **MR. SETRAKIAN:** Deputy Attorney General Will |
| 24 | Setrakian on behalf of defendants State of California and |
| 25 | California Secretary of State Shirley Weber. |

1          **THE COURT:**  Thank you very much.  I appreciate it.

2          **MR. DODGE:**  Chris Dodge on behalf of Intervenors

3   NAACP and Siren.

4          **MS. ZELPHIN:**  Grace Zelphin on behalf of Intervenors

5   League of Women Voters of California.

6          **THE COURT:**  Is anybody here representing what I call

7   the County case?

8          **MS. SHOAI:**  Good morning, Your Honor.

9          **THE COURT:**  Come on up.  What we're doing here may be

10  of interest to you.  So we want your appearance.

11         **MS. SHOAI:**  Thank you, Your Honor.  Deputy County

12  Counsel --

13         **THE COURT:**  No, no, wait, wait till we get a good

14  recording of you.

15         **MS. SHOAI:**  Good morning, Your Honor.  Deputy County

16  Counsel Suzanne Schoai on behalf of --

17         **THE COURT:**  I see.  Why don't you have a seat?  Do

18  you have any other colleague with you today?

19         **MS. SHOAI:**  No, Your Honor.

20         **THE COURT:**  All right.  So first, I'd like to address

21  plaintiff's motion for order to produce records pursuant to 52

22  U.S.C. 20701 that was filed on Monday, set for hearing

23  today.  I appreciate the speed, but not at the expense of due

24  process.  And although I've encouraged us to move forward as

25  quickly as possible concerning the substantive issues, this is

5

```
 1   not the due process because there needs to be at least 28 days'

 2   notice before a date for hearing under CD California Rule 6-1.

 3          The plaintiff is seeking to reach the ultimate

 4   question in this case regarding the production of records and

 5   thousands of voters' lives will be impacted by this case.  And

 6   the Court will not be setting the matter on any legal -- I

 7   don't want to say gamesmanship, but therefore, the motion for

 8   order to produce records pursuant to 52 U.S.C. 20701 is

 9   denied.

10          Now, you can once again follow the process and

11   procedure in terms of due process.  We'll have time

12   potentially, but this doesn't supply the due process needed.

13          Second, I'd like to hear arguments if there are any

14   on two motions regarding amicus briefs.  First, there was a

15   motion for leave to file an amicus brief brought by 16 states.

16   Those states are Arizona, Colorado, Delaware, Hawaii, Illinois,

17   Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico,

18   New York, Oregon, Rhode Island, Vermont, and Washington.

19          The second request was to file an amicus brief and it

20   was filed by the former secretaries of state and the proposed

21   amicus briefs are allegedly from a bipartisan group of state

22   secretaries for the states of Colorado, Connecticut, Minnesota,

23   Nebraska, Oregon, Pennsylvania, and Washington.

24          Does any party have a statement to make regarding

25   these amici briefs and any wisdom on your part that if I allow
```

6

1   these amici briefs, whether I should then extend for some

2   period of time the opportunity for additional briefs from

3   interested parties, because these are the parties that have

4   directly contacted the Court, but there may be other parties

5   that piecemeal choose to come in, and then I'm deciding that on

6   an almost ex-parte basis, case by case as they come to me,

7   unless you're flying out here for every single hearing for

8   every requested amici brief.

9          So I was thinking if I was going to allow these, that

10   I should throw this open for 7 days or 14 days for the amici

11   briefs to come in during the period of argument and try to sort

12   through whatever the Court's opinion would be and give you that

13   courtesy and simply extend it.  But I'm looking for your wisdom

14   on that because you can anticipate if I'm getting these amici

15   requests now, I promise you, as soon as you leave the

16   courtroom, there's going to be another request.  And I don't

17   want to do that ex parte without your wisdom on both parties'

18   parts.

19          So let's start with the first group.  This motion for

20   leave to file an amici brief by 16 states, and one of my

21   concerns was whether this would become a bipartisan effort, for

22   instance, of Democrats and Republicans using the Court in a

23   sense, in a political sense, not necessarily a substantive

24   sense.  But I noticed there are what I consider some swing

25   states, New Mexico certainly was during the last election,

1    those records to make sure we are doing our duty as the federal

2    government to make sure that these federal elections remain

3    free and fair.

4         And counsel simply has to rely on both

5    misrepresentations of the law and our position, stating our --

6    for example, that our whole case relies on Lynd.  No.  This

7    action relies on the Civil Rights Act of 1960 and its very

8    clear text, which is the one thing they don't want to talk

9    about because it's very clear.

10        Privacy concerns are first not a proper concern for

11   this motion to dismiss but even if they were, they're

12   unfounded.  Privacy -- the United States is going to comply

13   with all federal laws.  That includes the Federal Privacy Act.

14   The DOJ Civil Rights Division itself has a stated policy

15   available on a website as to how we will comply with the

16   Federal Privacy Act and have before.

17        **THE COURT:**  Explain that to me.

18        **MR. NEFF:**  Yes, sure.

19        So we publish a series of regulations.  They're

20   called the SORNs that show how we tend to the data and make

21   sure everything is properly protected under, not just Federal

22   Privacy Act, but other obvious concerns when you're dealing

23   with large databases.

24        **THE COURT:**  Is that part of my record?

25        **MR. NEFF:**  Yes.

72

1        **THE COURT:**  And what would I look at that?  What

2   exhibit?

3        **MR. NEFF:**  At our -- in our response to our motion to

4   dismiss and the supporting data for that, the attachments for

5   that.

6        However, I would state, that to any extent,

7   especially the state privacy-type acts would contradict the

8   Civil Rights Act, that the Civil Rights Act would rule.

9        The United States does this on a regular basis.  We

10  have multiple states that don't even see this as a dispute,

11  that simply just -- in fact, on their own do this on a regular

12  basis, share the information with the federal government so

13  that we can run crosschecks to make sure that people are

14  properly on voter rolls.

15        **THE COURT:**  What states are those that have shared

16  either their DMV registrations or the social security numbers

17  of voters?

18        **MR. NEFF:**  Offhand, right now, off of memory I

19  believe the states are Kansas, Indiana -- there are four.

20        **THE COURT:**  That's okay.

21        **MR. NEFF:**  I'll also state the biggest one is -- so

22  we also have an MOU that we produce at the state request.  Some

23  states request it, some don't.  Some say, yes, you're entitled

24  to this data, here you go.  And we have a whole data-sharing

25  setup ready.  It's essentially the Box program, plus some

73

1    federal proprietary encryption technology to make sure that

2    this is as secure as it needs to be.  And we -- so Texas just

3    told us today they're going to enter in the MOU and share us

4    the data in the next few days.  We believe many more states are

5    going to follow just in the next few days but so we have four

6    states that have already sent us the data.  No questions asked.

7    Probably another dozen or so states in the next week or so that

8    are just going to sign the MOU and share with us.  This really

9    shouldn't be controversial.  It's clearly stated as part of our

10   duty under HAVA and the <u>Civil Rights Act</u> is clear that this is

11   the mechanism in which we do it.

12          **THE COURT:**  Do you think that those states with

13   attorney generals complying with your request would be

14   interested in filing an amicus just as other states who may be

15   opposed to your request are filing amicus?  In other words,

16   what I want to do is make certain if we have states coming late

17   to the table but in compliance that we're looking at the

18   reasoning by all of the atty generals in the respective states.

19          And what I was worried about before, frankly, is if I

20   had red and blue states lining up when I started to look at the

21   amicus, I was particularly interested in the states bringing

22   that to me.

23          Now, I don't know how you define what I call -- well

24   those states that have voted for different -- in different

25   elections in different ways.  Arizona, New Mexico, Michigan,

74

1   Minnesota, seem to be what I call those states that

2   traditionally doesn't go Democrat or Republican.

3          And then I looked down at the state secretaries for

4   the states and if you notice, there are three states out of

5   there on the amicus.  Connecticut is in for the first time.

6   They are not part of the amicus for the 16 states that we

7   initially named but these are the state secretaries for the

8   states of and Connecticut is an addition, Nebraska is an

9   addition, Pennsylvania -- which has certainly been a swing

10  state.

11         So I was a little worried and that's why I sought

12  your wisdom about whether you all were going to stipulate to me

13  accepting this because I didn't know the weight if I was just

14  dealing with a party disagreement.  And I'm not saying that

15  these swing states necessarily carry greater or less weight but

16  I want to be alert that if this is a partisan effort.  And

17  certainly the country is divided so ...

18         **MR. NEFF:**  I would be --

19         **THE COURT:**  ... so I've got a stipulation that I'm

20  accepting all of these amicus briefs.  I just want to pay you

21  the courtesy if other states are coming onboard, like Texas, et

22  cetera, that we give them a chance for those attorney generals

23  to get this to us but by the same token, I'm going to be

24  writing over the next couple weeks.

25         Is two weeks enough time for you?

1          **MR. NEFF:**  We can inform the states that --

2          **THE COURT:**  Okay.

3          **MR. NEFF:**  -- a judge has invited them to file amicus

4   but --

5          **THE COURT:**  Will you do so?  In other words, for both

6   parties.  Get it out to all the states that you can and I'll

7   docket this, et cetera.  And there may even be disagreements

8   between different courts examining this matter and different

9   circuits.

10         **MR. NEFF:**  I think the bigger picture is that the

11  states that are complying are likely not going to see this as

12  something that they need to delve issue.

13         **THE COURT:**  But I just want to pay you the courtesy

14  in terms of due process.  Okay.

15         **MR. NEFF:**  Yes.  And I would say that's because this

16  really shouldn't be a political issue.  One side can make it a

17  political issue if they want to just simply in a single

18  position declare it that but it doesn't change the fact that

19  the Civil Rights Act of 1960, the text is quite clear and that

20  no one is in favor of faulty voter rolls.

21         **THE COURT:**  We've also had for both parties we've had

22  a series of state rights issues in the federal court for years.

23  And different states have taken a perspective on what the

24  states' rights issues are.  Some are much more state-right

25  oriented, others aren't.  That's why I was interested in the

 1   division.  But since you've all stipulated, I'm accepting this

 2   amicus at the present time.  I just want to make sure you've

 3   got the courtesy on both sides of any other parties coming

 4   onboard so if we need an extra week we can take it, okay?

 5            Okay.  Won't you continue.  I'm sorry.

 6            **MR. NEFF:**  Thank you, Your Honor.

 7            The -- would emphasize that this data is necessary

 8   for the United States to conduct its HAVA operation -- its HAVA

 9   enforcement compliance and that is why that data is

10   specifically cited in the statute.  It simply couldn't be

11   clearer that it needs to be the last four digits of a social

12   security number or the driver's license; otherwise, we are not

13   able to make a verified finding as to the various voter roll

14   registrations that might have problems.  In fact, we sometimes

15   even have to follow up after that data is run.  It's rare but

16   there's a reason that was put in the statute because it's

17   something like we can verify it from what I've talked to our

18   database analysts something like 99.999 percent of the time.

19   That's enough for us to be able to know if it's an actual

20   person that lives in that location and is who the voter

21   registration role says it is.

22        **(Pause)**

23            Again, with the caveat that we do not need to ever --

24   that we do not need to get to this.  This is essentially an OSC

25   where we only need to state our purpose and then we are

1   entitled to the records.  Also under a prompt order, according

2   to caselaw, a prompt order that this is essentially an OSC

3   hearing.

4          The facts of California itself are particularly

5   worrisome.  Maybe the most worrisome state in the union.

6          The state is required to provide various data to the

7   Election Assistance Commission which is a nonpartisan

8   commission.  The state -- the agency created by HAVA in order

9   to try and keep this as neutral as possible and California

10  doesn't provide the complete data.  Their data doesn't have Los

11  Angeles County in it.  It's one-fourth the state's population.

12  That on its own should cause concern countrywide that they've

13  not submitted that data.  It would be irresponsible of the

14  United States to not come in at this point and say we need to

15  see your data to ensure fair and free elections.

16         All of the harms that opposing counsel have pointed

17  to are based on speculation, logical leaps and there is no

18  concrete evidence they can point to.

19         That being said, with the overarching point that this

20  is before the Court right now as essentially an order for an

21  order to show cause, dressed up as a complaint, and that you

22  have a dismissal that is essentially fighting that order to

23  show cause, dressed up as a motion to dismiss, I believe the

24  Court should act within what would be its lawful authority to

25  issue a prompt order that California needs to turn those

1   records over to us that we are entitled to.

2       **THE COURT:** How do you deal with the state provisions

3   concerning the DMV? In other words, the state is arguing to

4   the Court that that has a -- for want of a better word -- a

5   special category that is not subject to the <u>Voting Rights Act</u>

6   <u>of 1960</u> or HAVA, and that they have a privacy interest in a

7   sense as well. What does the Court do with that?

8       **MR. NEFF:** Any state privacy interest would be

9   trumped by federal law. It would be trumped by both the

10  <u>Federal Privacy Act</u>, which we're complying with. It would be

11  trumped by HAVA, which is a -- I repeat -- a federal minimum

12  standards law for state compliance that specifically mentions

13  driver's license number or last four digits of social.

14      The state is required to produce and provide this

15  data under the statute. If they have some issue with the

16  driver's license; hypothetically, if a state just said we have

17  some real concerns about our driver's license, they comply with

18  the statute if they provide the last four of the social

19  security number.

20      Does the Court have other questions or concerns?

21      **THE COURT:** Just one moment. Let me look at a note

22  that I made.

23      **(Pause)**

24      The state represents that they have offered -- and I

25  think both in the Orange County case with the registrar -- and

1   it's represented today in the statewide case -- the names and

2   addresses.  Has that offer in fact been made?

3           **MR. NEFF:**  Has that offer --

4           **THE COURT:**  Yes.  To you.

5           **MR. NEFF:**  Oh --

6           **THE COURT:**  Not to you but to the government, the

7   DOJ.

8           **MR. NEFF:**  California has taken the unique in the

9   nation position that they are -- that they -- we are permitted

10  to come and inspect it in their offices, that data; which, (a),

11  is not sufficient; (b), we argue is not an appropriate way of

12  providing it in today's day and age where it's actually more

13  secure to share this data electronically through our shared

14  file-sharing --

15          **THE COURT:**  Kind of slow-walking you.  Kind of slow

16  walking.

17          **MR. NEFF:**  I think --

18          **THE COURT:**  For want of a better term.

19          **MR. NEFF:**  That is the United States' interpretation

20  of it but --

21          **THE COURT:**  How about the voter participation and the

22  registration methods?  Have those been offered to you?  In

23  other words, that's been argued to me but behind the scenes I

24  don't have that record right now.  Has that been offered to

25  you?

1          **MR. NEFF:**  It is in the back-and-forth is in the

2     letters attached as exhibits in the filings, Your Honor;

3     however, the United States' position is that the responses have

4     been woefully inadequate.

5          **THE COURT:**  Okay.  So we've never gotten down to

6     really how that information would be exchanged.  It's flowing

7     back and forth in terms of representations but as a practical

8     matter there's a big difference between a representation and

9     conveying the information to you.

10          **MR. NEFF:**  Well actually in our letters we did lay

11     out to opposing counsel our file-sharing program, how it works,

12     that it is secure and we invite them to -- assuming they have a

13     change of heart, to use it.

14          **THE COURT:**  About the registration status and the

15     contact information, has that been offered to you?

16          **MR. NEFF:**  That, I'm not sure about.  I'm not sure

17     what the scope of their offer is.

18          **THE COURT:**  Okay.

19          **MR. NEFF:**  I just know that it does not include the -

20     - for sure, does not include the driver's license number or the

21     last four of the social as required by the HAVA statute.  And

22     in other states as well, that has always been the crux of the

23     dispute.

24          **THE COURT:**  In their opening arguments they'd argued

25     that in the Benson case out of the Sixth Circuit, Bellows out

81

1   of the First and <u>Long</u> case out of the Fourth, that there's an

2   inconsistent and uniformed position taken by the government.

3   How do you respond to that?

4           **MR. NEFF:**  That the -- there is no inconsistency in

5   position.

6           **THE COURT:**  Explain that to me.

7           **MR. NEFF:**  What there is is difference in posture of

8   those cases.  It is a true statement to say that the United

9   States, as an agency, has yet to go to states to enforce the

10  minimum standards of the HAVA statute.  One can argue whether

11  that was a wise or unwise decision but here we are 23 years

12  later and the federal government has yet to do it.  It is

13  still, for certain, good law.  The United States believes it is

14  a law that should be enforced and complied with.  Therefore,

15  because of that history where this hasn't been done before, all

16  of those cases relate to private parties trying to in some way

17  get in.

18          The DOJ's position is that private parties do not

19  have a right of action under HAVA and therefore they should not

20  be allowed to go to states and say, I would like your driver's

21  license or social security number.  However, there are states

22  around the country, including ones that are fighting us, that

23  interestingly, have been willing to turn over that data to a

24  private organization without the same protections as the United

25  States.  That's been cited in our briefing, the ERIC

82

1    Organization.

2         So what I would say is all those cases are

3    inapplicable.  It often requires selectively quoting them to

4    make it sound like in some way the United States government is

5    not entitled to it.  No, the United States government is

6    uniquely mentioned in both the CRA and HAVA.  And therefore

7    just because this is the first time the United States is coming

8    in and doing it, doesn't mean that it's not clearly what the

9    statute states.

10        **THE COURT:**  For both parties, you mentioned that

11   California is one of the main outliers, for want of a better

12   word, from the DOJ and the executive branch's position.  Is it

13   the position of the executive branch that there need not be any

14   stated purpose that there's an absolute right to obtain this

15   information per statute?

16        **MR. NEFF:**  Statute requires we state a purpose.  A

17   purpose.

18        **THE COURT:**  And what is the purpose here?

19        **MR. NEFF:**  The purpose is for, as stated in our

20   letters to them, for voter roll maintenance enforcement and

21   compliance.

22        **THE COURT:**  And we stated in Orange County with a

23   limited county case involving Page.  There, there were -- and I

24   keep 13 or 17 but 17, I believe, allegations.  The most

25   notorious became the dog that voted twice.

1          Is that, out of 1.2 million voters, what's the basis,

2    for instance, of that kind of request because of course we're

3    always going to have error, including people who legitimately

4    die.  So what's the threshold that this stated purpose has?

5    How should I interpret that?

6          **MR. NEFF:**  Under the CRA there is no threshold.

7          **THE COURT:**  Okay.  Now, do you need to -- and thank

8    you.  Do you need to make any calls?  You're all by yourself,

9    you're doing -- there's nobody to consult with but do you need

10   to make any calls?  Are you satisfied with your argument?

11         **MR. NEFF:**  I appreciate the offer, Your Honor, but

12   no, we're satisfied.

13         **THE COURT:**  Okay.  There'll be a second round.

14         **MR. NEFF:**  Yes.

15         **THE COURT:**  So counsel, however you'd like to proceed

16   then.  One of you has another obligation, I don't care which

17   order.  You can take the intervenors first or the parties.

18      **(Pause)**

19         **MR. BRUDIGAM:**  So there was a lot going on there,

20   Your Honor, and so I'm going to try to be thorough in making

21   sure I cover all of those points.

22         So I think the first thing I want to talk about is

23   this notion that the complaint is just an order to show cause.

24   And essentially what the federal government wants to do is take

25   the Court and sideline them in this dispute and say that the

84

1    Court has no room for any judicial review here.  And that's

2    just not supported by the text of the statute.

3           There's nothing in the Civil Rights Act that creates

4    a special statutory procedure.  The words "order to show cause"

5    are not in the statute at all and I'll just read you the text

6    right here.

7           It says that:

8           "The appropriate district court shall have

9           jurisdiction by appropriate process to compel the

10          production of such record or paper."

11          That's what it says, "By appropriate process."  And

12   so that's up to the Court to decide what the appropriate

13   process is here.

14          And I'd also just point Your Honor to the fact that

15   the Federal Rules of Civil Procedure contemplate what rules

16   apply when you have a government investigative demand.  I mean

17   Federal Rule of Civil Procedure 81(a)(5) specifically says:

18          "The Federal Rules of Civil Procedure apply to

19          proceedings governing demands for records by the U.S.

20          government."

21          And so this idea that some other procedure applies,

22   it's not supported by the text, it's not supported by the

23   Federal Rules of Civil Procedure.  The only thing that supports

24   this purported procedure are these early 1960s' cases and like

25   we've said, the federal government, they pin their hopes on

1   this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's

2   the one they're referring to which says that the Court

3   shouldn't have any role here.

4        But that case is obviously nonbinding on Your Honor

5   and it's really been overruled.  I would point you to the

6   <u>United States v. Powell</u> case.

7        **THE COURT:**  I'm sorry, what -- just a moment.

8        **MR. BRUDIGAM:**  Sure.

9        **THE COURT:**  All right.  Please continue.  I've got my

10  note.

11       **MR. BRUDIGAM:**  So the Supreme Court in United States

12  v. Powell found that the Federal Rules of Civil Procedure, they

13  apply to a proceeding like this.  And in that case it involved

14  an IRS document request statute which used the very same

15  language that we have here which is that the Court shall, by

16  appropriate process, compel relief under that statute.  So even

17  if Your Honor found Kennedy v. Lynd persuasive, it's obviously

18  unbinding, that's been overruled.  So just to be clear, the

19  Federal Rules of Civil Procedure govern this action.

20       **THE COURT:**  Well, you've cited on both parties'

21  parts, different enactments by council, statutory provisions.

22  I think we can all agree that we want qualified voters to vote

23  without any chilling effect.

24       **MR. BRUDIGAM:**  I agree.

25       **THE COURT:**  Is there -- well I think we can all

1    stipulate to that.

2              **MR. BRUDIGAM:**  We can.

3              **THE COURT:**  And I'll use the word "qualified voters".

4              Is there a chilling effect in the request by the

5    government and if so, what is that chilling effect?  How would

6    there allegedly be persons who may believe that the government

7    has no business in the sense of getting more information.

8              **MR. BRUDIGAM:**  Sure I mean I think --

9              **THE COURT:**  And behind this the concern of this court

10   eventually, besides the statutory following the law, is going

11   to be the impact of what we write and do.  And this case will

12   probably be the first case that comes out that other circuits

13   look at.  So with that noble goal in mind of having voter

14   participation, is there a chilling effect or not?

15             **MR. BRUDIGAM:**  I think there's absolutely a chilling

16   effect here because --

17             **THE COURT:**  And I need you to define that for me.

18             **MR. BRUDIGAM:**  Sure.

19             **THE COURT:**  And it may not be relevant to the opinion

20   but behind all of this, we need voters who are qualified to be

21   able to vote.

22             **MR. BRUDIGAM:**  Right.

23             **THE COURT:**  Now the ease of that could be differences

24   between different administrations and whether you have

25   different methodologies.  And I know there's a huge controversy

1  about mail-in ballots and voter registration and drive-in, et

2  cetera, but when we're finally done with this, we want

3  qualified voters to vote.  And if there's a chilling effect, or

4  this privacy right that we've somewhat skipped over, I want to

5  hear how you define that.

6          MR. BRUDIGAM:  Sure.  Your Honor, I think this action

7  should make the stomach of every American turn, knowing that

8  this executive branch is going in, state by state, collecting

9  and vacuuming up everybody's voter registration information.

10 It is on a scale that we have never seen before.  Okay.

11         And what this is going to do --

12         THE COURT:  It is their disparity argument.  In other

13 words, remember when I started this conversation early on, and

14 I discussed the amicus briefs, I was particularly interested if

15 I was getting just red and blue states.  That's why I was

16 looking to see if there were these swing states.

17         MR. BRUDIGAM:  I mean I point Your Honor to --

18         THE COURT:  Or is this a argument also that a

19 particular group of states are being examined versus other

20 states?  Because here, the government has represented while

21 California from their perception might be an outlier, they've

22 also made inquiries of the let's say more, from their

23 standpoint, compliant states like Kansas and -- I forget which

24 one -- just a moment -- Indiana, and that Texas was coming

25 onboard.

1        **MR. BRUDIGAM:**  Yeah.  Well, what I would say is I

2   mean those aren't states that are complying, they're

3   voluntarily giving that information to the federal government.

4        **THE COURT:**  But regardless, the government has made

5   an inquiry so if there's an argument that the government is

6   reaching out and being selective, if the state is voluntarily

7   complying that doesn't seem to me to be singling out

8   progressive states.  And if you think that, then I need to hear

9   that and hear your reasoning behind that.

10        **MR. BRUDIGAM:**  I'm not saying they're singling out

11   states.

12        **THE COURT:**  Okay.  Then we can pass that.

13        **MR. BRUDIGAM:**  They're going after every state and

14   California is by no means --

15        **THE COURT:**  So I'm not going to have a disparity

16   argument.

17        **MR. BRUDIGAM:**  Right, right.  I just mean in terms of

18   the position the secretary has taken, I mean the reason they

19   had to sue 14 different states is because nobody wants to turn

20   this data over.  The representations that Counsel just gave

21   today, that's the first that I've heard of any state turning

22   over that information.  So we are by no means an outlier in

23   taking this position.

24        **THE COURT:**  Wait just a moment.  For the government

25   or DOJ, how do we validate Kansas and Indiana?  What validation

89

1  do I have about that?

2          **MR. NEFF:**  I was actually looking that up right now,

3  Your Honor, because --

4          **THE COURT:**  Well go ahead and look it up.  You've got

5  lots of time.

6          **MR. NEFF:**  And I --

7          **THE COURT:**  By the way, I'm not holding you to it.  I

8  know it's in good faith but I'd like to hear what states that

9  we have validation for turning this document over.  And there

10 may be numerous states.

11         **MR. NEFF:**  It's a good-faith representation here.  I

12 am kind of a point --

13         **THE COURT:**  Okay.  Well now take away the good faith.

14 I accept that.  Okay, I'm asking for proof now.

15         **MR. NEFF:**  Okay.  Wyoming, Kansas, Indiana and

16 Arkansas all complied voluntarily.

17         **THE COURT:**  Okay.  Just a moment.

18         **MR. NEFF:**  Texas --

19         **THE COURT:**  Kansas, Indiana, Wyoming and Arkansas ...

20         **MR. NEFF:**  ... have already complied ...

21         **THE COURT:**  ... voluntarily.

22         **MR. NEFF:**  ... voluntarily.

23         **THE COURT:**  Okay.  Texas?

24         **MR. NEFF:**  Texas, Virginia, Utah, Tennessee, South

25 Dakota --

90

1         **THE COURT:**  Just a moment.

2         **MR. NEFF:**  Oh it's gonna go long, yeah.  South

3  Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama,

4  all fall into the list of they have expressed with us a

5  willingness to comply based on the represented MOU that we have

6  sent them.  And so we expect full --

7         **THE COURT:**  Now apparently Nebraska can't make up its

8  mind because of the proposed amici briefed to the Court, they

9  have the former state secretaries of state for Colorado,

10  Connecticut, Minnesota and guess what?  Nebraska.

11         **MR. NEFF:**  Well those are former.  And furthermore,

12  just because some states are representing certain things in

13  court, there are still discussions going on now that this MOU

14  we have is fully blessed.  There are the -- I don't think it's

15  safe at this point to go beyond those states but --

16         **THE COURT:**  Then that's fine.

17         **MR. NEFF:**  -- that's a fair representation of the

18  state of discussions as of today.

19         **THE COURT:**  And Counsel, back to you.

20         **MR. BRUDIGAM:**  Sure.  And yeah, so all I heard there

21  was we've heard a willingness.  It doesn't sound like those

22  states have actually turned over any data, just to be clear.

23         So I want to talk a little bit about --

24         **THE COURT:**  No, I think he said that four states have

25  actually.  Kansas --

1      **MR. BRUDIGAM:**  Four states have actually turned over

2  but the broader list --

3      **THE COURT:**  -- Indiana, Wyoming and Arkansas.

4      **MR. BRUDIGAM:**  Right.

5      **THE COURT:**  The others were a purported willingness.

6      **MR. BRUDIGAM:**  Right.

7      So Your Honor, the federal government is really

8  leaning hard into the text of these statutes and they say that

9  we don't want to talk about the text but that's just absolutely

10  not true.  And I want to just start with the Civil Rights Act

11  of 1960.

12      There is a very clear statutory limitation in that

13  provision and it's in Section 20703.  And it says that the

14  attorney general's demand shall contain a statement of the

15  basis and the purpose therefore.  DOJ has not satisfied this

16  requirement and so their demand is invalid plainly under the

17  statutory text.

18      **THE COURT:**  So the plain representation by the

19  government is too broad; and that is, they want to stop voter

20  fraud.

21      **MR. BRUDIGAM:**  Well, so they've mentioned a couple of

22  things.  It keeps changing so I want to unpack this a little

23  bit.

24      So they said that the purpose is free and fair

25  elections, clean voter rolls.  Then he said up here that it's

1   for enforcing HAVA.  So these are multiple different bases.

2   And also it's different than the -- or than the purpose that

3   was originally articulated in the letters to the secretary.

4          The original request said that it was -- they were

5   seeking it for NVRA voter list -- list maintenance compliance.

6   So the reason and rationale keeps shifting and changing.  And

7   that's a problem, not just because it's suspicious, it's a

8   problem because, again, the text says, "The demand shall

9   contain a statement of the basis and the purpose therefore.

10  The text use of the article."  'The,' twice, in front of the

11  basis and the purpose indicates that there is only one basis

12  and one purpose.

13         And the federal government has explicitly rejected

14  this plain text reading.  They said it up here that they just

15  need to give you any old basis and then the demand is good.

16         **THE COURT:**  That's my question also to both of you;

17  and that is, does the executive branch need to state a purpose?

18  Your argument is that they do.

19         **MR. BRUDIGAM:**  They do.

20         **THE COURT:**  Counsel for DOJ puts that in broad terms.

21         **MR. BRUDIGAM:**  Right.  Well but again, it's not just

22  a purpose, it's -- or not just the purpose, it's also the

23  basis.

24         **THE COURT:**  Okay.

25         **MR. BRUDIGAM:**  And they have not alleged any basis

93

1    anywhere in their action.

2            Now, I also want to talk about -- and just -- you

3    know this -- I'm sorry.  I want to talk a little bit more about

4    HAVA, which is the law that apparently now that's the main

5    method of enforcement we're now learning today, that that's

6    what they want to enforce and they specifically reference the

7    requirement under HAVA that states collect social security

8    numbers and driver's license numbers.  Well let's look to the

9    text of HAVA.  What does it say?

10            "The state shall determine whether the information

11            provided by an individual is sufficient to meet the

12            requirements of this subparagraph in accordance with

13            state law."

14            And that is -- when it says "this subparagraph," it's

15    referring directly to the requirement that states collect that

16    information when processing voter registration applications.

17    So there is nothing for the federal government to enforce here.

18    This is solely the state's domain.

19            And as I said in my original motion, another

20    provision of HAVA explicitly delegates discretion of

21    implementation of HAVA to the states.  So again, we're not

22    afraid of the text in this case, we think it strongly supports

23    our position.  And so I also want to talk about what this data

24    could be used for.

25            So we've heard a lot of different reasons.  I just

1   explained why it's not relevant for HAVA.  I want to also talk

2   about why it's not relevant for List Maintenance under the

3   NVRA.

4          So the legal standard under the NVRA requires states

5   to conduct a general program that makes a reasonable effort.

6   So the Sixth Circuit held this year in that Benson case that

7   this just means a serious attempt, a rational, sensible

8   approach.  It need not be perfect or optimal.  And so under

9   this standard, getting line-by-line voter information of their

10  social security numbers and driver's license numbers, that's

11  entirely unrelated to whether a general program exists or

12  whether the state is making a reasonable effort.  And so,

13  again, at every turn, the supposed reason why they need this

14  information, it just doesn't add up.

15         And then finally, I want to talk about they claimed,

16  as they did in their brief, that California has, quote, "the

17  most worrisome voter registration data in the nation."  That's

18  just absolutely wrong, okay?  That's an assertion in a brief

19  without any support.

20         And they also incorrectly say that in submitting data

21  to the Election Administration Commission in response to the

22  EACs survey, this is an election administration survey, they

23  said the LA County didn't submit any data.  That's not true.

24  That's simply not true.  You can go to the survey and look at

25  the data that LA submitted and you can look at our explanation

1    to DOJ in our letters in advance (inaudible) litigation

2    explaining the questions they had about that survey.  So to the

3    extent that they want to rely on EACs as some after-the-fact

4    rationalization for this demand, it just doesn't make sense.

5    It doesn't add up.

6            So those are the main --

7            **THE COURT:**  Were there inconsistent or consistent

8    offers if you're aware of the Page case, as well as this case.

9    In other words, when this started in Orange County, originally

10   counsel was here, there's a representation about the registrar

11   there making the same or similar representations about what

12   they were willing to share with DOJ but I've never compared the

13   two.  And I don't know what the state's position is because

14   DOJ's argument might be, we're getting inconsistent data.  In

15   other words, even when we're sharing, with the different

16   entities promising that they'll share some amount of this data,

17   the different counties are supplying this in different ways.

18           **MR. BRUDIGAM:**  Sure.  So I won't speak too much about

19   that case but I would say that case is different and there

20   isn't a problem of inconsistent data sharing because in the

21   state case, they're saying, give us the whole list.  We want

22   every voter.

23           In Orange County, they said, we want a list of just

24   the individuals that have been removed from your list because

25   of non-citizenship, people who renounced or for whatever

```
 1   reason.

 2              THE COURT:  So this is much broader from your

 3   perspective in terms of protection, privacy, HAVA.

 4              MR. BRUDIGAM:  Yeah.  It's not an issue of can they

 5   be reconciled.

 6              So I do want to just back up again and just zoom out

 7   on the big picture here in this case.

 8              You know, as we talked about -- my colleague talked

 9   about, in his motion, that the states really have the primary

10   role in administering elections and the voter registration

11   process.  The Constitution makes that quite clear in the

12   elections clause.  And it makes sense to prioritize the state

13   in this process because they're the ones that are closer to the

14   voters, more accountable to the voters.  And so this is an

15   arrangement that it depends on the principle of subsidiarity

16   where a decision should be made at the local level.  And here,

17   we don't -- there's no place for the federal government to come

18   in and start demanding these records under that constitutional

19   framework.

20              And not only are the states the default entity

21   running elections but it's only Congress that can make or alter

22   those rules.  Here, we have the executive branch in court

23   trying to get this information.  The Constitution says nothing

24   about the executive branch having any role in federal

25   elections.
```

1        And I would just say that this is not a unique

2  position by this administration.  The president has been

3  meddling in state election law since he came into office.  And

4  I would point Your Honor to a case in the District of

5  Massachusetts, California v. Trump, where the executive was

6  doing something sort of similar where they were going in under

7  the guise of federal law and trying the change the way states

8  administer and conduct elections and that was pursuant to an

9  executive order the president issued.  And so here, we're

10 having another situation where the federal government is coming

11 in under the guise of inapplicable federal laws and trying to

12 interfere with the state's role in elections.  And so I'd just

13 say against that backdrop, it's important to keep that in mind;

14 but even if, you know, considering all that, if you'd just go

15 back to the text of these statutes, the federal government is

16 not entitled to this information under those laws.

17        And so at this point I want to turn it over to my

18 colleague, Will Setrakian, to just provide some rebuttal on the

19 federal privacy laws issue.

20        **THE COURT:**  Thank you.  And once again, would you

21 state your name because we're on CourtSmart.

22        **MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will

23 Setrakian for defendants, The State of California and

24 California Secretary of State Shirley Weber.  Just four quick

25 points on the federal privacy statute.