# EXHIBIT B

```
               UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
               (WESTERN DIVISION - LOS ANGELES)



UNITED STATES OF AMERICA,     ) CASE NO: 2:25-cv-09149-DOC-ADSx
                              )
             Plaintiff,       )            CIVIL
                              )
    vs.                       )    Los Angeles, California
                              )
SHIRLEY WEBER, ET AL,         )  Thursday, December 4, 2025
                              )  ( 7:38 a.m. to  9:09 a.m.)
             Defendants.      )  (12:01 p.m. to 12:58 p.m.)
                              )  ( 2:00 p.m. to  2:31 p.m.)
                                 ( 2:31 p.m. to  2:33 p.m.)


                        HEARING RE:

              MOTION TO DISMISS [DKT.NO.67];

        PLAINTIFF'S REQUEST FOR ORDER TO PRODUCE RECORDS
                       (52 USC 20701)
                   [DKT.NOS.87,88,89]



            BEFORE THE HONORABLE DAVID O. CARTER,
               UNITED STATES DISTRICT JUDGE



APPEARANCES:              SEE PAGE 2


Court Reporter:           Recorded; CourtSmart


Courtroom Deputy:         Karlen Dubon


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

**APPEARANCES**:


For Plaintiff:          ERIC V. NEFF, ESQ.
                        U.S. Department of Justice
                        150 M St. NE, Suite 8-139
                        Washington, DC 20002
                        202-532-3628


For Intervenors:        GRAYCE S.P. ZELPHIN, ESQ.
                        American Civil Liberties
                        Union of Northern California
                        39 Drumm Street
                        San Francisco, CA 94111
                        530-515-8978

                        CHRISTOPHER D. DODGE, ESQ.
                        Elias Law Group
                        250 Massachusetts Ave. NW
                        Suite 400
                        Washington, DC 20001
                        202-987-4928


For Robert Page:        SUZANNE E. SHOAI, ESQ.
                        Orange County Counsel
                        P.O. Box 1379
                        Santa Ana, CA 92702
                        714-834-3300


For Defendants:         MALCOLM A. BRUDIGAM, ESQ.
                        Office of the Attorney General
                        1300 I Street
                        Suite 125
                        Sacramento, CA 95814
                        916-210-7873

                        ROBERT W. SETRAKIAN, ESQ.
                        California Department of Justice
                        300 S. Spring Street
                        Suite 1702
                        Los Angeles, CA 90013
                        213-269-6668

| | |
|---|---|
| 1 | **Los Angeles, California; Thursday, December 4, 2025; 7:38 a.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE COURT:** -- Shirley Weber. |
| 4 | **(Pause)** |
| 5 | **THE COURT:** And, counsel, as you're seated, let me |
| 6 | take one more matter. Just remain seated for a moment. |
| 7 | **(Pause)** |
| 8 | **THE COURT:** All right. Thank you then. I think that |
| 9 | resolves the rest of the morning calendar. So first of all, |
| 10 | good morning. |
| 11 | **MR. NEFF:** Good morning, Your Honor. |
| 12 | **THE COURT:** This is the matter of United States v. |
| 13 | Shirley Weber. It's case number 25-09149. And, counsel, you |
| 14 | can just remain seated. You can pretend it's state court if |
| 15 | you want to, but make your appearances. |
| 16 | **MR. NEFF:** Eric Neff on behalf of the United States. |
| 17 | Good morning, Your Honor. |
| 18 | **THE COURT:** Thank you. |
| 19 | **MR. BRUDIGAM:** Deputy Attorney General Malcolm |
| 20 | Brudigam on behalf of defendants Secretary of State Shirley |
| 21 | Weber and the State of California. |
| 22 | **THE COURT:** Okay, thank you very much. |
| 23 | **MR. SETRAKIAN:** Deputy Attorney General Will |
| 24 | Setrakian on behalf of defendants State of California and |
| 25 | California Secretary of State Shirley Weber. |

1          **THE COURT:**  Thank you very much.  I appreciate it.

2          **MR. DODGE:**  Chris Dodge on behalf of Intervenors

3     NAACP and Siren.

4          **MS. ZELPHIN:**  Grace Zelphin on behalf of Intervenors

5     League of Women Voters of California.

6          **THE COURT:**  Is anybody here representing what I call

7     the County case?

8          **MS. SHOAI:**  Good morning, Your Honor.

9          **THE COURT:**  Come on up.  What we're doing here may be

10    of interest to you.  So we want your appearance.

11         **MS. SHOAI:**  Thank you, Your Honor.  Deputy County

12    Counsel --

13         **THE COURT:**  No, no, wait, wait till we get a good

14    recording of you.

15         **MS. SHOAI:**  Good morning, Your Honor.  Deputy County

16    Counsel Suzanne Schoai on behalf of --

17         **THE COURT:**  I see.  Why don't you have a seat?  Do

18    you have any other colleague with you today?

19         **MS. SHOAI:**  No, Your Honor.

20         **THE COURT:**  All right.  So first, I'd like to address

21    plaintiff's motion for order to produce records pursuant to 52

22    U.S.C. 20701 that was filed on Monday, set for hearing

23    today.  I appreciate the speed, but not at the expense of due

24    process.  And although I've encouraged us to move forward as

25    quickly as possible concerning the substantive issues, this is

 1   not the due process because there needs to be at least 28 days'

 2   notice before a date for hearing under CD California Rule 6-1.

 3          The plaintiff is seeking to reach the ultimate

 4   question in this case regarding the production of records and

 5   thousands of voters' lives will be impacted by this case.  And

 6   the Court will not be setting the matter on any legal -- I

 7   don't want to say gamesmanship, but therefore, the motion for

 8   order to produce records pursuant to 52 U.S.C. 20701 is

 9   denied.

10          Now, you can once again follow the process and

11   procedure in terms of due process.  We'll have time

12   potentially, but this doesn't supply the due process needed.

13          Second, I'd like to hear arguments if there are any

14   on two motions regarding amicus briefs.  First, there was a

15   motion for leave to file an amicus brief brought by 16 states.

16   Those states are Arizona, Colorado, Delaware, Hawaii, Illinois,

17   Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico,

18   New York, Oregon, Rhode Island, Vermont, and Washington.

19          The second request was to file an amicus brief and it

20   was filed by the former secretaries of state and the proposed

21   amicus briefs are allegedly from a bipartisan group of state

22   secretaries for the states of Colorado, Connecticut, Minnesota,

23   Nebraska, Oregon, Pennsylvania, and Washington.

24          Does any party have a statement to make regarding

25   these amici briefs and any wisdom on your part that if I allow

1    these amici briefs, whether I should then extend for some

2    period of time the opportunity for additional briefs from

3    interested parties, because these are the parties that have

4    directly contacted the Court, but there may be other parties

5    that piecemeal choose to come in, and then I'm deciding that on

6    an almost ex-parte basis, case by case as they come to me,

7    unless you're flying out here for every single hearing for

8    every requested amici brief.

9            So I was thinking if I was going to allow these, that

10    I should throw this open for 7 days or 14 days for the amici

11    briefs to come in during the period of argument and try to sort

12    through whatever the Court's opinion would be and give you that

13    courtesy and simply extend it.  But I'm looking for your wisdom

14    on that because you can anticipate if I'm getting these amici

15    requests now, I promise you, as soon as you leave the

16    courtroom, there's going to be another request.  And I don't

17    want to do that ex parte without your wisdom on both parties'

18    parts.

19            So let's start with the first group.  This motion for

20    leave to file an amici brief by 16 states, and one of my

21    concerns was whether this would become a bipartisan effort, for

22    instance, of Democrats and Republicans using the Court in a

23    sense, in a political sense, not necessarily a substantive

24    sense.  But I noticed there are what I consider some swing

25    states, New Mexico certainly was during the last election,

1   those records to make sure we are doing our duty as the federal

2   government to make sure that these federal elections remain

3   free and fair.

4           And counsel simply has to rely on both

5   misrepresentations of the law and our position, stating our --

6   for example, that our whole case relies on Lynd.  No.  This

7   action relies on the Civil Rights Act of 1960 and its very

8   clear text, which is the one thing they don't want to talk

9   about because it's very clear.

10          Privacy concerns are first not a proper concern for

11  this motion to dismiss but even if they were, they're

12  unfounded.  Privacy -- the United States is going to comply

13  with all federal laws.  That includes the Federal Privacy Act.

14  The DOJ Civil Rights Division itself has a stated policy

15  available on a website as to how we will comply with the

16  Federal Privacy Act and have before.

17          **THE COURT:**  Explain that to me.

18          **MR. NEFF:**  Yes, sure.

19          So we publish a series of regulations.  They're

20  called the SORNs that show how we tend to the data and make

21  sure everything is properly protected under, not just Federal

22  Privacy Act, but other obvious concerns when you're dealing

23  with large databases.

24          **THE COURT:**  Is that part of my record?

25          **MR. NEFF:**  Yes.

72

**THE COURT:**  And what would I look at that?  What exhibit?

**MR. NEFF:**  At our -- in our response to our motion to dismiss and the supporting data for that, the attachments for that.

However, I would state, that to any extent, especially the state privacy-type acts would contradict the Civil Rights Act, that the Civil Rights Act would rule.

The United States does this on a regular basis.  We have multiple states that don't even see this as a dispute, that simply just -- in fact, on their own do this on a regular basis, share the information with the federal government so that we can run crosschecks to make sure that people are properly on voter rolls.

**THE COURT:**  What states are those that have shared either their DMV registrations or the social security numbers of voters?

**MR. NEFF:**  Offhand, right now, off of memory I believe the states are Kansas, Indiana -- there are four.

**THE COURT:**  That's okay.

**MR. NEFF:**  I'll also state the biggest one is -- so we also have an MOU that we produce at the state request.  Some states request it, some don't.  Some say, yes, you're entitled to this data, here you go.  And we have a whole data-sharing setup ready.  It's essentially the Box program, plus some

73

1   federal proprietary encryption technology to make sure that

2   this is as secure as it needs to be.  And we -- so Texas just

3   told us today they're going to enter in the MOU and share us

4   the data in the next few days.  We believe many more states are

5   going to follow just in the next few days but so we have four

6   states that have already sent us the data.  No questions asked.

7   Probably another dozen or so states in the next week or so that

8   are just going to sign the MOU and share with us.  This really

9   shouldn't be controversial.  It's clearly stated as part of our

10  duty under HAVA and the Civil Rights Act is clear that this is

11  the mechanism in which we do it.

12          **THE COURT:**  Do you think that those states with

13  attorney generals complying with your request would be

14  interested in filing an amicus just as other states who may be

15  opposed to your request are filing amicus?  In other words,

16  what I want to do is make certain if we have states coming late

17  to the table but in compliance that we're looking at the

18  reasoning by all of the atty generals in the respective states.

19          And what I was worried about before, frankly, is if I

20  had red and blue states lining up when I started to look at the

21  amicus, I was particularly interested in the states bringing

22  that to me.

23          Now, I don't know how you define what I call -- well

24  those states that have voted for different -- in different

25  elections in different ways.  Arizona, New Mexico, Michigan,

1    Minnesota, seem to be what I call those states that

2    traditionally doesn't go Democrat or Republican.

3            And then I looked down at the state secretaries for

4    the states and if you notice, there are three states out of

5    there on the amicus.  Connecticut is in for the first time.

6    They are not part of the amicus for the 16 states that we

7    initially named but these are the state secretaries for the

8    states of and Connecticut is an addition, Nebraska is an

9    addition, Pennsylvania -- which has certainly been a swing

10   state.

11           So I was a little worried and that's why I sought

12   your wisdom about whether you all were going to stipulate to me

13   accepting this because I didn't know the weight if I was just

14   dealing with a party disagreement.  And I'm not saying that

15   these swing states necessarily carry greater or less weight but

16   I want to be alert that if this is a partisan effort.  And

17   certainly the country is divided so ...

18           **MR. NEFF:**  I would be --

19           **THE COURT:**  ... so I've got a stipulation that I'm

20   accepting all of these amicus briefs.  I just want to pay you

21   the courtesy if other states are coming onboard, like Texas, et

22   cetera, that we give them a chance for those attorney generals

23   to get this to us but by the same token, I'm going to be

24   writing over the next couple weeks.

25           Is two weeks enough time for you?

1          **MR. NEFF:**  We can inform the states that --

2          **THE COURT:**  Okay.

3          **MR. NEFF:**  -- a judge has invited them to file amicus

4    but --

5          **THE COURT:**  Will you do so?  In other words, for both

6    parties.  Get it out to all the states that you can and I'll

7    docket this, et cetera.  And there may even be disagreements

8    between different courts examining this matter and different

9    circuits.

10         **MR. NEFF:**  I think the bigger picture is that the

11   states that are complying are likely not going to see this as

12   something that they need to delve issue.

13         **THE COURT:**  But I just want to pay you the courtesy

14   in terms of due process.  Okay.

15         **MR. NEFF:**  Yes.  And I would say that's because this

16   really shouldn't be a political issue.  One side can make it a

17   political issue if they want to just simply in a single

18   position declare it that but it doesn't change the fact that

19   the <u>Civil Rights Act of 1960</u>, the text is quite clear and that

20   no one is in favor of faulty voter rolls.

21         **THE COURT:**  We've also had for both parties we've had

22   a series of state rights issues in the federal court for years.

23   And different states have taken a perspective on what the

24   states' rights issues are.  Some are much more state-right

25   oriented, others aren't.  That's why I was interested in the

1  division.  But since you've all stipulated, I'm accepting this

2  amicus at the present time.  I just want to make sure you've

3  got the courtesy on both sides of any other parties coming

4  onboard so if we need an extra week we can take it, okay?

5          Okay.  Won't you continue.  I'm sorry.

6          **MR. NEFF:**  Thank you, Your Honor.

7          The -- would emphasize that this data is necessary

8  for the United States to conduct its HAVA operation -- its HAVA

9  enforcement compliance and that is why that data is

10  specifically cited in the statute.  It simply couldn't be

11  clearer that it needs to be the last four digits of a social

12  security number or the driver's license; otherwise, we are not

13  able to make a verified finding as to the various voter roll

14  registrations that might have problems.  In fact, we sometimes

15  even have to follow up after that data is run.  It's rare but

16  there's a reason that was put in the statute because it's

17  something like we can verify it from what I've talked to our

18  database analysts something like 99.999 percent of the time.

19  That's enough for us to be able to know if it's an actual

20  person that lives in that location and is who the voter

21  registration role says it is.

22      **(Pause)**

23          Again, with the caveat that we do not need to ever --

24  that we do not need to get to this.  This is essentially an OSC

25  where we only need to state our purpose and then we are

77

1     entitled to the records.  Also under a prompt order, according

2     to caselaw, a prompt order that this is essentially an OSC

3     hearing.

4           The facts of California itself are particularly

5     worrisome.  Maybe the most worrisome state in the union.

6           The state is required to provide various data to the

7     Election Assistance Commission which is a nonpartisan

8     commission.  The state -- the agency created by HAVA in order

9     to try and keep this as neutral as possible and California

10    doesn't provide the complete data.  Their data doesn't have Los

11    Angeles County in it.  It's one-fourth the state's population.

12    That on its own should cause concern countrywide that they've

13    not submitted that data.  It would be irresponsible of the

14    United States to not come in at this point and say we need to

15    see your data to ensure fair and free elections.

16          All of the harms that opposing counsel have pointed

17    to are based on speculation, logical leaps and there is no

18    concrete evidence they can point to.

19          That being said, with the overarching point that this

20    is before the Court right now as essentially an order for an

21    order to show cause, dressed up as a complaint, and that you

22    have a dismissal that is essentially fighting that order to

23    show cause, dressed up as a motion to dismiss, I believe the

24    Court should act within what would be its lawful authority to

25    issue a prompt order that California needs to turn those

 1   records over to us that we are entitled to.

 2       **THE COURT:**  How do you deal with the state provisions

 3   concerning the DMV?  In other words, the state is arguing to

 4   the Court that that has a -- for want of a better word -- a

 5   special category that is not subject to the Voting Rights Act

 6   of 1960 or HAVA, and that they have a privacy interest in a

 7   sense as well.  What does the Court do with that?

 8       **MR. NEFF:**  Any state privacy interest would be

 9   trumped by federal law.  It would be trumped by both the

10   Federal Privacy Act, which we're complying with.  It would be

11   trumped by HAVA, which is a -- I repeat -- a federal minimum

12   standards law for state compliance that specifically mentions

13   driver's license number or last four digits of social.

14       The state is required to produce and provide this

15   data under the statute.  If they have some issue with the

16   driver's license; hypothetically, if a state just said we have

17   some real concerns about our driver's license, they comply with

18   the statute if they provide the last four of the social

19   security number.

20       Does the Court have other questions or concerns?

21       **THE COURT:**  Just one moment.  Let me look at a note

22   that I made.

23       **(Pause)**

24       The state represents that they have offered -- and I

25   think both in the Orange County case with the registrar -- and

 1    it's represented today in the statewide case -- the names and

 2    addresses.  Has that offer in fact been made?

 3            **MR. NEFF:**  Has that offer --

 4            **THE COURT:**  Yes.  To you.

 5            **MR. NEFF:**  Oh --

 6            **THE COURT:**  Not to you but to the government, the

 7    DOJ.

 8            **MR. NEFF:**  California has taken the unique in the

 9    nation position that they are -- that they -- we are permitted

10    to come and inspect it in their offices, that data; which, (a),

11    is not sufficient; (b), we argue is not an appropriate way of

12    providing it in today's day and age where it's actually more

13    secure to share this data electronically through our shared

14    file-sharing --

15            **THE COURT:**  Kind of slow-walking you.  Kind of slow

16    walking.

17            **MR. NEFF:**  I think --

18            **THE COURT:**  For want of a better term.

19            **MR. NEFF:**  That is the United States' interpretation

20    of it but --

21            **THE COURT:**  How about the voter participation and the

22    registration methods?  Have those been offered to you?  In

23    other words, that's been argued to me but behind the scenes I

24    don't have that record right now.  Has that been offered to

25    you?

1      **MR. NEFF:**  It is in the back-and-forth is in the

2   letters attached as exhibits in the filings, Your Honor;

3   however, the United States' position is that the responses have

4   been woefully inadequate.

5          **THE COURT:**  Okay.  So we've never gotten down to

6   really how that information would be exchanged.  It's flowing

7   back and forth in terms of representations but as a practical

8   matter there's a big difference between a representation and

9   conveying the information to you.

10         **MR. NEFF:**  Well actually in our letters we did lay

11  out to opposing counsel our file-sharing program, how it works,

12  that it is secure and we invite them to -- assuming they have a

13  change of heart, to use it.

14         **THE COURT:**  About the registration status and the

15  contact information, has that been offered to you?

16         **MR. NEFF:**  That, I'm not sure about.  I'm not sure

17  what the scope of their offer is.

18         **THE COURT:**  Okay.

19         **MR. NEFF:**  I just know that it does not include the -

20  - for sure, does not include the driver's license number or the

21  last four of the social as required by the HAVA statute.  And

22  in other states as well, that has always been the crux of the

23  dispute.

24         **THE COURT:**  In their opening arguments they'd argued

25  that in the Benson case out of the Sixth Circuit, Bellows out

1   of the First and <u>Long</u> case out of the Fourth, that there's an

2   inconsistent and uniformed position taken by the government.

3   How do you respond to that?

4         **MR. NEFF:**  That the -- there is no inconsistency in

5   position.

6         **THE COURT:**  Explain that to me.

7         **MR. NEFF:**  What there is is difference in posture of

8   those cases.  It is a true statement to say that the United

9   States, as an agency, has yet to go to states to enforce the

10  minimum standards of the HAVA statute.  One can argue whether

11  that was a wise or unwise decision but here we are 23 years

12  later and the federal government has yet to do it.  It is

13  still, for certain, good law.  The United States believes it is

14  a law that should be enforced and complied with.  Therefore,

15  because of that history where this hasn't been done before, all

16  of those cases relate to private parties trying to in some way

17  get in.

18        The DOJ's position is that private parties do not

19  have a right of action under HAVA and therefore they should not

20  be allowed to go to states and say, I would like your driver's

21  license or social security number.  However, there are states

22  around the country, including ones that are fighting us, that

23  interestingly, have been willing to turn over that data to a

24  private organization without the same protections as the United

25  States.  That's been cited in our briefing, the ERIC

82

1    Organization.

2         So what I would say is all those cases are

3    inapplicable.  It often requires selectively quoting them to

4    make it sound like in some way the United States government is

5    not entitled to it.  No, the United States government is

6    uniquely mentioned in both the CRA and HAVA.  And therefore

7    just because this is the first time the United States is coming

8    in and doing it, doesn't mean that it's not clearly what the

9    statute states.

10        **THE COURT:**  For both parties, you mentioned that

11   California is one of the main outliers, for want of a better

12   word, from the DOJ and the executive branch's position.  Is it

13   the position of the executive branch that there need not be any

14   stated purpose that there's an absolute right to obtain this

15   information per statute?

16        **MR. NEFF:**  Statute requires we state a purpose.  A

17   purpose.

18        **THE COURT:**  And what is the purpose here?

19        **MR. NEFF:**  The purpose is for, as stated in our

20   letters to them, for voter roll maintenance enforcement and

21   compliance.

22        **THE COURT:**  And we stated in Orange County with a

23   limited county case involving Page.  There, there were -- and I

24   keep 13 or 17 but 17, I believe, allegations.  The most

25   notorious became the dog that voted twice.

83

1          Is that, out of 1.2 million voters, what's the basis,

2    for instance, of that kind of request because of course we're

3    always going to have error, including people who legitimately

4    die.  So what's the threshold that this stated purpose has?

5    How should I interpret that?

6          **MR. NEFF:**  Under the CRA there is no threshold.

7          **THE COURT:**  Okay.  Now, do you need to -- and thank

8    you.  Do you need to make any calls?  You're all by yourself,

9    you're doing -- there's nobody to consult with but do you need

10   to make any calls?  Are you satisfied with your argument?

11         **MR. NEFF:**  I appreciate the offer, Your Honor, but

12   no, we're satisfied.

13         **THE COURT:**  Okay.  There'll be a second round.

14         **MR. NEFF:**  Yes.

15         **THE COURT:**  So counsel, however you'd like to proceed

16   then.  One of you has another obligation, I don't care which

17   order.  You can take the intervenors first or the parties.

18      **(Pause)**

19         **MR. BRUDIGAM:**  So there was a lot going on there,

20   Your Honor, and so I'm going to try to be thorough in making

21   sure I cover all of those points.

22         So I think the first thing I want to talk about is

23   this notion that the complaint is just an order to show cause.

24   And essentially what the federal government wants to do is take

25   the Court and sideline them in this dispute and say that the

1     this one <u>Kennedy v. Lynd</u>, Fifth Circuit case from 1962.  That's

2     the one they're referring to which says that the Court

3     shouldn't have any role here.

4          But that case is obviously nonbinding on Your Honor

5     and it's really been overruled.  I would point you to the

6     <u>United States v. Powell</u> case.

7          **THE COURT:**  I'm sorry, what -- just a moment.

8          **MR. BRUDIGAM:**  Sure.

9          **THE COURT:**  All right.  Please continue.  I've got my

10    note.

11         **MR. BRUDIGAM:**  So the Supreme Court in United States

12    v. Powell found that the Federal Rules of Civil Procedure, they

13    apply to a proceeding like this.  And in that case it involved

14    an IRS document request statute which used the very same

15    language that we have here which is that the Court shall, by

16    appropriate process, compel relief under that statute.  So even

17    if Your Honor found Kennedy v. Lynd persuasive, it's obviously

18    unbinding, that's been overruled.  So just to be clear, the

19    Federal Rules of Civil Procedure govern this action.

20         **THE COURT:**  Well, you've cited on both parties'

21    parts, different enactments by council, statutory provisions.

22    I think we can all agree that we want qualified voters to vote

23    without any chilling effect.

24         **MR. BRUDIGAM:**  I agree.

25         **THE COURT:**  Is there -- well I think we can all

 1   stipulate to that.

 2            **MR. BRUDIGAM:**  We can.

 3            **THE COURT:**  And I'll use the word "qualified voters".

 4            Is there a chilling effect in the request by the

 5   government and if so, what is that chilling effect?  How would

 6   there allegedly be persons who may believe that the government

 7   has no business in the sense of getting more information.

 8            **MR. BRUDIGAM:**  Sure I mean I think --

 9            **THE COURT:**  And behind this the concern of this court

10   eventually, besides the statutory following the law, is going

11   to be the impact of what we write and do.  And this case will

12   probably be the first case that comes out that other circuits

13   look at.  So with that noble goal in mind of having voter

14   participation, is there a chilling effect or not?

15            **MR. BRUDIGAM:**  I think there's absolutely a chilling

16   effect here because --

17            **THE COURT:**  And I need you to define that for me.

18            **MR. BRUDIGAM:**  Sure.

19            **THE COURT:**  And it may not be relevant to the opinion

20   but behind all of this, we need voters who are qualified to be

21   able to vote.

22            **MR. BRUDIGAM:**  Right.

23            **THE COURT:**  Now the ease of that could be differences

24   between different administrations and whether you have

25   different methodologies.  And I know there's a huge controversy

1    about mail-in ballots and voter registration and drive-in, et

2    cetera, but when we're finally done with this, we want

3    qualified voters to vote.  And if there's a chilling effect, or

4    this privacy right that we've somewhat skipped over, I want to

5    hear how you define that.

6          MR. BRUDIGAM:  Sure.  Your Honor, I think this action

7    should make the stomach of every American turn, knowing that

8    this executive branch is going in, state by state, collecting

9    and vacuuming up everybody's voter registration information.

10   It is on a scale that we have never seen before.  Okay.

11          And what this is going to do --

12          THE COURT:  It is their disparity argument.  In other

13   words, remember when I started this conversation early on, and

14   I discussed the amicus briefs, I was particularly interested if

15   I was getting just red and blue states.  That's why I was

16   looking to see if there were these swing states.

17          MR. BRUDIGAM:  I mean I point Your Honor to --

18          THE COURT:  Or is this a argument also that a

19   particular group of states are being examined versus other

20   states?  Because here, the government has represented while

21   California from their perception might be an outlier, they've

22   also made inquiries of the let's say more, from their

23   standpoint, compliant states like Kansas and -- I forget which

24   one -- just a moment -- Indiana, and that Texas was coming

25   onboard.

1          **MR. BRUDIGAM:**  Yeah.  Well, what I would say is I

2     mean those aren't states that are complying, they're

3     voluntarily giving that information to the federal government.

4          **THE COURT:**  But regardless, the government has made

5     an inquiry so if there's an argument that the government is

6     reaching out and being selective, if the state is voluntarily

7     complying that doesn't seem to me to be singling out

8     progressive states.  And if you think that, then I need to hear

9     that and hear your reasoning behind that.

10          **MR. BRUDIGAM:**  I'm not saying they're singling out

11     states.

12          **THE COURT:**  Okay.  Then we can pass that.

13          **MR. BRUDIGAM:**  They're going after every state and

14     California is by no means --

15          **THE COURT:**  So I'm not going to have a disparity

16     argument.

17          **MR. BRUDIGAM:**  Right, right.  I just mean in terms of

18     the position the secretary has taken, I mean the reason they

19     had to sue 14 different states is because nobody wants to turn

20     this data over.  The representations that Counsel just gave

21     today, that's the first that I've heard of any state turning

22     over that information.  So we are by no means an outlier in

23     taking this position.

24          **THE COURT:**  Wait just a moment.  For the government

25     or DOJ, how do we validate Kansas and Indiana?  What validation

1    do I have about that?

2          **MR. NEFF:**  I was actually looking that up right now,

3    Your Honor, because --

4          **THE COURT:**  Well go ahead and look it up.  You've got

5    lots of time.

6          **MR. NEFF:**  And I --

7          **THE COURT:**  By the way, I'm not holding you to it.  I

8    know it's in good faith but I'd like to hear what states that

9    we have validation for turning this document over.  And there

10   may be numerous states.

11         **MR. NEFF:**  It's a good-faith representation here.  I

12   am kind of a point --

13         **THE COURT:**  Okay.  Well now take away the good faith.

14   I accept that.  Okay, I'm asking for proof now.

15         **MR. NEFF:**  Okay.  Wyoming, Kansas, Indiana and

16   Arkansas all complied voluntarily.

17         **THE COURT:**  Okay.  Just a moment.

18         **MR. NEFF:**  Texas --

19         **THE COURT:**  Kansas, Indiana, Wyoming and Arkansas ...

20         **MR. NEFF:**  ... have already complied ...

21         **THE COURT:**  ... voluntarily.

22         **MR. NEFF:**  ... voluntarily.

23         **THE COURT:**  Okay.  Texas?

24         **MR. NEFF:**  Texas, Virginia, Utah, Tennessee, South

25   Dakota --

1          THE COURT:  Just a moment.

2          MR. NEFF:  Oh it's gonna go long, yeah.  South

3    Carolina, Nebraska, Montana, Mississippi, Missouri and Alabama,

4    all fall into the list of they have expressed with us a

5    willingness to comply based on the represented MOU that we have

6    sent them.  And so we expect full --

7          THE COURT:  Now apparently Nebraska can't make up its

8    mind because of the proposed amici briefed to the Court, they

9    have the former state secretaries of state for Colorado,

10   Connecticut, Minnesota and guess what?  Nebraska.

11         MR. NEFF:  Well those are former.  And furthermore,

12   just because some states are representing certain things in

13   court, there are still discussions going on now that this MOU

14   we have is fully blessed.  There are the -- I don't think it's

15   safe at this point to go beyond those states but --

16         THE COURT:  Then that's fine.

17         MR. NEFF:  -- that's a fair representation of the

18   state of discussions as of today.

19         THE COURT:  And Counsel, back to you.

20         MR. BRUDIGAM:  Sure.  And yeah, so all I heard there

21   was we've heard a willingness.  It doesn't sound like those

22   states have actually turned over any data, just to be clear.

23         So I want to talk a little bit about --

24         THE COURT:  No, I think he said that four states have

25   actually.  Kansas --

91

1          **MR. BRUDIGAM:**  Four states have actually turned over

2     but the broader list --

3          **THE COURT:**  -- Indiana, Wyoming and Arkansas.

4          **MR. BRUDIGAM:**  Right.

5          **THE COURT:**  The others were a purported willingness.

6          **MR. BRUDIGAM:**  Right.

7          So Your Honor, the federal government is really

8     leaning hard into the text of these statutes and they say that

9     we don't want to talk about the text but that's just absolutely

10    not true.  And I want to just start with the Civil Rights Act

11    of 1960.

12          There is a very clear statutory limitation in that

13    provision and it's in Section 20703.  And it says that the

14    attorney general's demand shall contain a statement of the

15    basis and the purpose therefore.  DOJ has not satisfied this

16    requirement and so their demand is invalid plainly under the

17    statutory text.

18          **THE COURT:**  So the plain representation by the

19    government is too broad; and that is, they want to stop voter

20    fraud.

21          **MR. BRUDIGAM:**  Well, so they've mentioned a couple of

22    things.  It keeps changing so I want to unpack this a little

23    bit.

24          So they said that the purpose is free and fair

25    elections, clean voter rolls.  Then he said up here that it's

92

1    for enforcing HAVA.  So these are multiple different bases.

2    And also it's different than the -- or than the purpose that

3    was originally articulated in the letters to the secretary.

4         The original request said that it was -- they were

5    seeking it for NVRA voter list -- list maintenance compliance.

6    So the reason and rationale keeps shifting and changing.  And

7    that's a problem, not just because it's suspicious, it's a

8    problem because, again, the text says, "The demand shall

9    contain a statement of the basis and the purpose therefore.

10   The text use of the article."  'The,' twice, in front of the

11   basis and the purpose indicates that there is only one basis

12   and one purpose.

13        And the federal government has explicitly rejected

14   this plain text reading.  They said it up here that they just

15   need to give you any old basis and then the demand is good.

16        **THE COURT:**  That's my question also to both of you;

17   and that is, does the executive branch need to state a purpose?

18   Your argument is that they do.

19        **MR. BRUDIGAM:**  They do.

20        **THE COURT:**  Counsel for DOJ puts that in broad terms.

21        **MR. BRUDIGAM:**  Right.  Well but again, it's not just

22   a purpose, it's -- or not just the purpose, it's also the

23   basis.

24        **THE COURT:**  Okay.

25        **MR. BRUDIGAM:**  And they have not alleged any basis

1    anywhere in their action.

2            Now, I also want to talk about -- and just -- you

3    know this -- I'm sorry.  I want to talk a little bit more about

4    HAVA, which is the law that apparently now that's the main

5    method of enforcement we're now learning today, that that's

6    what they want to enforce and they specifically reference the

7    requirement under HAVA that states collect social security

8    numbers and driver's license numbers.  Well let's look to the

9    text of HAVA.  What does it say?

10           "The state shall determine whether the information

11           provided by an individual is sufficient to meet the

12           requirements of this subparagraph in accordance with

13           state law."

14           And that is -- when it says "this subparagraph," it's

15   referring directly to the requirement that states collect that

16   information when processing voter registration applications.

17   So there is nothing for the federal government to enforce here.

18   This is solely the state's domain.

19           And as I said in my original motion, another

20   provision of HAVA explicitly delegates discretion of

21   implementation of HAVA to the states.  So again, we're not

22   afraid of the text in this case, we think it strongly supports

23   our position.  And so I also want to talk about what this data

24   could be used for.

25           So we've heard a lot of different reasons.  I just

1   explained why it's not relevant for HAVA.  I want to also talk

2   about why it's not relevant for List Maintenance under the

3   NVRA.

4          So the legal standard under the NVRA requires states

5   to conduct a general program that makes a reasonable effort.

6   So the Sixth Circuit held this year in that <u>Benson</u> case that

7   this just means a serious attempt, a rational, sensible

8   approach.  It need not be perfect or optimal.  And so under

9   this standard, getting line-by-line voter information of their

10  social security numbers and driver's license numbers, that's

11  entirely unrelated to whether a general program exists or

12  whether the state is making a reasonable effort.  And so,

13  again, at every turn, the supposed reason why they need this

14  information, it just doesn't add up.

15         And then finally, I want to talk about they claimed,

16  as they did in their brief, that California has, quote, "the

17  most worrisome voter registration data in the nation."  That's

18  just absolutely wrong, okay?  That's an assertion in a brief

19  without any support.

20         And they also incorrectly say that in submitting data

21  to the Election Administration Commission in response to the

22  EACs survey, this is an election administration survey, they

23  said the LA County didn't submit any data.  That's not true.

24  That's simply not true.  You can go to the survey and look at

25  the data that LA submitted and you can look at our explanation

1   to DOJ in our letters in advance (inaudible) litigation

2   explaining the questions they had about that survey.  So to the

3   extent that they want to rely on EACs as some after-the-fact

4   rationalization for this demand, it just doesn't make sense.

5   It doesn't add up.

6          So those are the main --

7          **THE COURT:**  Were there inconsistent or consistent

8   offers if you're aware of the Page case, as well as this case.

9   In other words, when this started in Orange County, originally

10  counsel was here, there's a representation about the registrar

11  there making the same or similar representations about what

12  they were willing to share with DOJ but I've never compared the

13  two.  And I don't know what the state's position is because

14  DOJ's argument might be, we're getting inconsistent data.  In

15  other words, even when we're sharing, with the different

16  entities promising that they'll share some amount of this data,

17  the different counties are supplying this in different ways.

18         **MR. BRUDIGAM:**  Sure.  So I won't speak too much about

19  that case but I would say that case is different and there

20  isn't a problem of inconsistent data sharing because in the

21  state case, they're saying, give us the whole list.  We want

22  every voter.

23         In Orange County, they said, we want a list of just

24  the individuals that have been removed from your list because

25  of non-citizenship, people who renounced or for whatever

1    reason.

2         **THE COURT:** So this is much broader from your

3    perspective in terms of protection, privacy, HAVA.

4         **MR. BRUDIGAM:** Yeah. It's not an issue of can they

5    be reconciled.

6         So I do want to just back up again and just zoom out

7    on the big picture here in this case.

8         You know, as we talked about -- my colleague talked

9    about, in his motion, that the states really have the primary

10   role in administering elections and the voter registration

11   process. The Constitution makes that quite clear in the

12   elections clause. And it makes sense to prioritize the state

13   in this process because they're the ones that are closer to the

14   voters, more accountable to the voters. And so this is an

15   arrangement that it depends on the principle of subsidiarity

16   where a decision should be made at the local level. And here,

17   we don't -- there's no place for the federal government to come

18   in and start demanding these records under that constitutional

19   framework.

20        And not only are the states the default entity

21   running elections but it's only Congress that can make or alter

22   those rules. Here, we have the executive branch in court

23   trying to get this information. The Constitution says nothing

24   about the executive branch having any role in federal

25   elections.

97

1          And I would just say that this is not a unique

2    position by this administration.  The president has been

3    meddling in state election law since he came into office.  And

4    I would point Your Honor to a case in the District of

5    Massachusetts, <u>California v. Trump</u>, where the executive was

6    doing something sort of similar where they were going in under

7    the guise of federal law and trying the change the way states

8    administer and conduct elections and that was pursuant to an

9    executive order the president issued.  And so here, we're

10   having another situation where the federal government is coming

11   in under the guise of inapplicable federal laws and trying to

12   interfere with the state's role in elections.  And so I'd just

13   say against that backdrop, it's important to keep that in mind;

14   but even if, you know, considering all that, if you'd just go

15   back to the text of these statutes, the federal government is

16   not entitled to this information under those laws.

17          And so at this point I want to turn it over to my

18   colleague, Will Setrakian, to just provide some rebuttal on the

19   federal privacy laws issue.

20          **THE COURT:**  Thank you.  And once again, would you

21   state your name because we're on CourtSmart.

22          **MR. SETRAKIAN:**  Good afternoon, Your Honor.  Will

23   Setrakian for defendants, The State of California and

24   California Secretary of State Shirley Weber.  Just four quick

25   points on the federal privacy statute.