# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>GREGG M. AMORE, in his official<br>capacity as Secretary of State for the<br>State of Rhode Island,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 25-cv-00639-MSM-PAS

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

On September 8, 2025, the United States Department of Justice ("DOJ") sent a letter to Rhode Island Secretary of State Gregg Amore requesting an unredacted electronic copy of Rhode Island's statewide voter registration list. (ECF No. 2-2 at 5–7.) This list would include the last four digits of registered voters' Social Security numbers and their Rhode Island driver's license numbers. *Id.* at 5. DOJ has, over the last year, made similar demands to nearly every other state. When Secretary Amore refused to provide a voter registration list containing that sensitive information, the United States sued. (ECF No. 1.)

Before the Court is the United States' Motion to Compel Production (EFC No. 2) of an unredacted copy of Rhode Island's voter registration list. Also before the Court are the Motions to Dismiss of Secretary Amore (ECF No. 26), Intervenors Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches (ECF No.

25), and Intervenors SEIU District 1199NE, the Rhode Island Alliance for Retired Americans, Carolyn Betensky, and Michael "Zack" Mezera (ECF No. 28) (collectively, "Defendants").  For the following reasons, the Court DENIES the United States' Motion to Compel Production (ECF No. 2) and GRANTS Defendants' Motions to Dismiss (ECF Nos. 25; 26; 28).

## I.    BACKGROUND

The Elections Clause of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators."  U.S. Const. art. I, § 4, cl. 1.  The authority delegated to the states in managing elections includes the authority to oversee "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  Thus, except where federal law provides otherwise, states have substantial discretion in regulating elections, including maintaining voter registration lists.  *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013).

Two federal laws require each state to undertake a "reasonable effort" to maintain the accuracy and currency of its statewide voter registration list.  First, the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, requires states to "conduct a general program that makes a reasonable effort to remove the names of

2

ineligible voters from the official lists of eligible voters" who die or change their residence, as well as to send confirmation notices to voters following any change in residence. *Id.* § 20507(a)–(f). To facilitate public oversight, each covered state must "maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject to specific exemptions. *Id.* at § 20705(i). Nothing in the NVRA "prohibits the appropriate redaction of uniquely or highly sensitive personal information" from voting registration records. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).

Second, the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, requires each state to develop a single, computerized official statewide voter registration list that includes a unique identifier for reach registered voter. *Id.* § 21083(a)(1)(A). As part of this requirement, states must also adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(4)(A). HAVA has no public disclosure requirements and provides DOJ with no subpoena authority. *See id.* § 21111. HAVA expressly provides that the "specific choices on the methods of complying with [its] requirements . . . shall be left to the discretion of the State." *Id.* 21085.

In 2005, the Rhode Island Secretary of State implemented a statewide central voter register called the Central Voter Registration System ("CVRS").  R.I. Gen. Laws § 17-6-1.2.  A person seeking to register to vote must complete a Voter Registration Form, which collects a range of confidential and sensitive personally identifiable information.   410-RICR-20-00-19.5(A).   No voter may have more than one voter registration.  R.I. Gen. Laws § 17-9.1-19.  Registrants must confirm their United States citizenship, residence in Rhode Island, and that they are at least 16 years of age.  *Id.* §§ 17-9.1-11, 17-9.1-33.  Registrants must provide a Rhode Island driver's license or State ID card number or the last four digits of their Social Security number. 410-RICR-20-00-19.5(A)(1)(d)(1).  All registrants must "swear or affirm" that they are a U.S. citizen, live at the address listed on the form, and will be at least eighteen years old before voting in next general election.  410-RICR-20-00-19.5(A)(1)(k).  These attestations must be signed under penalty of perjury, and Rhode Island law criminalizes providing false voter registration information.  R.I. Gen. Laws § 17-9.1-12.

Rhode Island uses several different methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from its voter registration list.   Voter information, which is by default automatically updated anytime a voter updates their address with the Rhode Island Department of Motor Vehicles, is electronically transmitted daily to the CVRS.  R.I. Gen. Laws § 17-9.1-7(d).   An online voter registration portal allows citizens to update their voter information at any time.  *Id.* § 17-9.1-34.  The state requires each city or town's local

4

board to confirm registered voters' addresses through the mail, and it engages in a confirmation process where mailed confirmation forms are returned as undeliverable. *Id.* §§ 17-9.1-25, 17-9.1-26.   Rhode Island verifies voter information through verification mailings conducted each year.  *Id.* § 17-9.1-27(b).

The Rhode Island Office of the State Registrar of Vital Records electronically transmits a list of deceased persons eighteen years of age or older monthly, *see id.* § 23-3-5(a)(6); 100-RICR-20-00-5(C)(2), and local boards of canvassers update the list using information provided by the federal Social Security Administration's Death Master File, *see* R.I. Gen. Laws § 17-10-1(c).  Rhode Island participates in the Electronic Registration Information Center ("ERIC"), which uses a variety of datasets, including state voter registration and DMV records, to determine the accuracy of states' voter rolls.  *See* ECF No. 2-1 at 11 (acknowledging Rhode Island's participation in ERIC).  Rhode Island also updates the CVRS to ensure that people who are ineligible to vote because they are incarcerated for a felony conviction are removed from the voter registration list.  100-RICR-20-00-2(2.4)(C)(1-2); 100 RICR-20-00-5(C)(3).

In its September 8, 2025, letter to Secretary Amore (the "Demand Letter"), DOJ stated that the purpose of its demand for an unredacted copy of Rhode Island's statewide voter registration list was "to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and the HAVA." (ECF No. 2-2 at 6.) The Demand Letter did not identify any facts suggesting that Rhode Island has not complied with the NVRA and HAVA, and it did not otherwise expressly identify any

factual basis for DOJ's demand. *See id.* The Demand Letter states that DOJ's authority to request Rhode Island's voter registration list was made pursuant to (1) "the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions"; (2) HAVA . . . via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements"; and (3) Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq. Id.* at 5–6.

In response to the Demand Letter, on September 16, 2025, Secretary Amore sent a letter to DOJ offering to supply DOJ with a copy of Rhode Island's publicly available voter registration list but declining to supply the unredacted information specified by DOJ in its demand. *Id.* at 9–10. Secretary Amore's response contended that the authorities cited by DOJ did not authorize its demand. *Id.* Specifically, Secretary Amore asserted that the CRA "allows access to voter records only in connection with an investigation into the infringement or denial of constitutional voting rights" which was not the purpose stated in DOJ's letter. *Id.* at 10.

The United States filed suit against Secretary Amore in his official capacity on December 2, 2025, alleging that his refusal to provide the unredacted voter registration list violated the CRA. (ECF No. 1.) That same day, the United States filed a Motion to Compel Production (ECF No. 2), requesting the Court order Secretary Amore turn over the unredacted voter registration lists pursuant to a "special statutory proceeding" purportedly authorized by the CRA.

The Court subsequently granted unopposed Motions to Intervene (ECF Nos. 5; 15) by two groups of Intervenors. The first group consists of Common Cause—a "non-partisan, good-government organization dedicated to grassroots voter engagement in Rhode Island"—and three Rhode Island voters. (ECF No. 5 at 8.) The second group consists of SEIU District 1199NE and the Rhode Island Alliance for Retired Americans—Rhode Island membership-based organizations asserting an interest in preventing sensitive personal information on Rhode Island's statewide voter list from being disclosed to the federal government—and two Rhode Island voters. Secretary Amore and the Intervenors all move to dismiss the United States' Complaint. (ECF Nos. 25; 26; 28.)

The Court held a hearing on the parties' Motions on March 26, 2026. *See* ECF No. 47 (hearing transcript). In that hearing, the United States proposed that its unprecedented demands for unredacted voting rolls are the result of its "trust but verify" approach to the states' list maintenance efforts. *Id.* at 49. Despite some references to a 2024 Election Assistance Commission report purportedly showing that Rhode Island could conduct more kinds of voter registration list audits than it currently does, *see id.* at 46, 68, 86, the United States acknowledged that the Demand Letter stated no factual basis for DOJ's request, *id.* at 63.

While the present Motions were pending, four other federal district courts issued decisions on nearly identical cases brought by the United States seeking unredacted voter registration information from California, Oregon, Michigan, and Massachusetts. *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL

7

118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Galvin*, No. CV 25-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026). All four courts dismissed the United States' lawsuits.

## II.   STANDARD OF REVIEW

The parties dispute the appropriate standard of review for this case. According to the United States, it is entitled under Title III of the CRA to a "special statutory proceeding" on its Motion to Compel Production, under which the Court is restricted to a "severely limited" inquiry. (ECF No. 33 at 5.) Title III's text does not expressly provide for such a proceeding and instead provides that district courts have jurisdiction over voting records demands "by appropriate process." 52 U.S.C. § 20705. The sole support for the United States' position is a line of Fifth Circuit cases from the 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).

Defendants argue that the Federal Rules of Civil Procedure govern this case, and that DOJ is not entitled to any sort of summary or abbreviated procedures for obtaining the information it seeks. (ECF No. 23–26.) The Court agrees. Two years after *Lynd*—a decision that is not binding on this Court and is steeped in the context of 1960s racial discrimination in voter registration—the Supreme Court held that a demand made pursuant to a similar statute authorizing the production of documents by "appropriate process" could be challenged "on any appropriate ground," and that the Government was required to show that they had met all of the statutory criteria

8

for their request. *See United States v. Powell*, 379 U.S. 48, 57–58 (1964); *see also Weber*, 2026 WL 118807, at *8 ("Contrary to the position the DOJ takes, Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause."); *United States v. Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.").[1]

As such, the appropriate standard of review for this case is that common to motions to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6). Under that standard, to avoid dismissal, a plaintiff must set forth a "plausible claim." The reviewing court must assume the truth of all "well-pleaded facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Thomas v. Rhode Island,* 542 F.3d 944 (1st Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.   DISCUSSION

Defendants challenge the United States' demand as failing to state a claim under Title III of the CRA, exceeding the scope of production required by the CRA, and in violation of both state and federal privacy laws. (ECF No. 26-1 at 25–50.)

---

[1] The Court also shares the *United States v. Oregon* court's doubt that *Lynd* could be applicable here where—unlike *Lynd*, which "appears to contemplate an application directly to the court for the records—the United States "made an affirmative choice to file a complaint and proceed through ordinary litigation." 2026 WL 318402, at *8 (citing *Lynd*, 306 F.2d at 225).

Because this case is resolved by the first of these grounds, the Court focuses its

analysis there.

To begin, the Court turns to the context of Title III of the CRA, as explained in

*Weber*:

> Title III of the Civil Rights Act of 1960 was passed during the Jim Crow
> era, when persistent voter suppression was preventing Black Americans
> from voting. States were utilizing literacy tests, arbitrary registration
> tactics, voter ID laws, and poll taxes to keep minorities away from the
> ballot. Black Americans risked intimidation and violence every time
> they tried to access the polls.  To hide their complicity in voter
> suppression, state officials destroyed the records of Black Americans
> who had registered to vote, as well as those denied the opportunity to
> register.  The bipartisan Commission on Civil Rights lamented in 1958
> that even when records were not destroyed, states refused to turn them
> over, thwarting efforts by the federal government to investigate whether
> there was a pattern and practice of disenfranchising Black Americans.
> Title III was enacted directly in response to these concerns, requiring
> states to retain and preserve all records pertaining to voter registration,
> voting applications, and payments of poll taxes.

2026 WL 118807 at \*1.

Based on this context, Title III's purpose is to enable the federal government

to detect voting-related racial discrimination.  *Id.* at \*8.  To accomplish this, Title III

sets out certain requirements regarding federal election records, and penalizes the

theft, destruction, or alteration of those records.  *See* 52 U.S.C. §§ 20701, 20702.  Title

III further authorizes the Attorney General to compel the production of those voting

records upon a written demand.  *Id.* § 20703.

At issue in this case is whether the Attorney General may use § 20703 to

demand voting records for purposes unrelated to voting-related racial discrimination.

The statute itself does not cabin its application solely to that context.  But it does

10

impose one crucial requirement on any voting records demand by the Attorney General: the demand "shall contain a statement of the basis and the purpose therefore." *Id.*

The United States' position is that "the basis for the demand was Title III of the [CRA]," and that "the purpose was 'to ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA.'" (ECF No. 33 at 4.) But the Court finds that neither the basis nor the purpose proposed by the United States for its demand is legally sufficient to support a claim under Title III.

First, the Court agrees with *Weber*, *United States v. Oregon*, and *Galvin* that the "basis" contemplated by Title III is a factual, not legal basis. *See Weber*, 2026 WL 118807, at *9; *United States v. Oregon*, 2026 WL 318402, at *8–9; *Galvin*, 2026 WL 972129, at *4.[2] To read "basis" as meaning a legal basis would conflate that requirement with the required statement of the demand's "purpose." As explained in *United States v. Oregon*, "[i]f the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose." 2026 WL 318402, at *9; *see also Galvin*, 2026 WL 972129, at *5 ("If Congress sought to direct the Attorney General to include a citation to Title III in demand letters, requiring the letter to contain a 'statement of

---

[2] *Benson* also appears to have contemplated "basis" as meaning a factual basis, but—unlike here—the demand letter there actually did contain at least some factual basis for the records request. *See* 2026 WL 362789, at *8 (reviewing how DOJ's demand letter "pointed to several purported anomalies within Michigan's voter registration data: a high percentage of registered voters, a low confirmation notice rate, a low voter removal rate, and a high duplicate registration rate").

the basis and the purpose therefor' would not be the obvious way to do so."). While the United States suggests that Title III essentially authorizes factually groundless "fishing expeditions," *see* ECF No. 47 at 63, Congress could not have intended Title III to be interpreted in this redundant and circular manner.

This reading is consistent with the line of Fifth Circuit cases, most notably *Lynd*, upon which the United States presses the Court to rely here. In *Lynd*, for example, the court noted that the Attorney General's demand letter made the following statement of basis and purpose:

> This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.
>
> The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred

306 F.2d at 226 n.6; *see also id.* at 226 (referring to the "factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand"). *Lynd* thus seems to contemplate a factual basis and a legal purpose under Title III.

With that understanding, the Court finds that the Attorney General's demand lacks a legally sufficient basis to satisfy Title III's requirements. Absent from the demand are any factual allegations suggesting that Rhode Island may be violating

12

the list maintenance requirements of the NVRA and HAVA, let alone the CRA. This alone would be enough to foreclose judicial enforcement of the demand.[3]

Following *Galvin*'s dismissal of the United States' suit in Massachusetts, the United States requested that, should the Court follow *Galvin*, DOJ be permitted leave to send Secretary Amore a "curing elaboration letter" presumably containing some factual basis for its Title III demand. But even were the Demand Letter to contain a factual basis, it would still fail to state a claim under Title III because it lacks a legally sufficient purpose. The Court again finds itself in agreement with both *Weber* and *United States v. Oregon* in determining that Congress cannot have intended Title III as permitting such a demand based on a statement of *any* purpose. *See Weber*, 2026 WL 118807, at *9 (noting that the fact that Title III precedes the NVRA means that it cannot have been passed "as a tool for NVRA compliance"); *United States v. Oregon*, 2026 WL 318402, at *9–10 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function.") (emphasis in original).

Instead, the Court finds persuasive *United States v. Oregon*'s conclusion that, "[r]eading Title III's text within its larger statutory and historical context, and consistent with . . . case law and legislative history . . . the 'purpose' required in a

---

[3] This would likely be true even were the Court to apply the "special statutory proceeding" described in *Lynd*. Based on *Lynd*, the United States proposes that the Court's review is limited to, *inter alia*, assessing the following question: "did the Attorney General make a written demand for federal records stating the basis and purpose." (ECF No. 33 at 5) (citing *Lynd*, 306 F.2d at 225–26). But if the written demand contains *no* statement of a basis within the meaning of 52 U.S.C. § 20703— that is, a factual basis—then that threshold requirement is not satisfied.

demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." 2026 WL 318402, at *10. With that established, the purpose stated in the Attorney General's demand—purportedly, to ensure compliance with the NVRA and HAVA—does not plausibly relate to individual voting rights. As such, even were the Court to grant DOJ leave to send its requested "curing elaboration letter" containing a factual basis for its allegation that Rhode Island might be falling short of its obligations under the NVRA or HAVA, that letter would remain legally insufficient to support a Title III records demand because its purpose would fall outside Title III's intended scope.

## IV.    CONCLUSION

Neither the NVRA nor HAVA authorize DOJ to conduct the kind of fishing expedition it seeks here. As such, for the foregoing reasons, the Court DENIES the United States' Motion to Compel Production (ECF No. 2) and GRANTS Defendants' Motions to Dismiss (ECF Nos. 25; 26; 28).

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

April 17, 2026

14